## GRAND CENTRAL PARTNERSHIP, INC. Plaintiff-Appellant,

v.

Andrew CUOMO, as Secretary of the United States Department of Housing and Urban Development, Defendant-Appellee.

No. 351, Docket 98–6027.

United States Court of Appeals, Second Circuit.

Argued Sept. 15, 1998.

Decided Jan. 28, 1999.

476

Paul J. Fishman, Friedman, Kaplan & Seiler, LLP, New York, N.Y. (Robert S. Loigman, of counsel), for Appellant.

Andrew M. Manshel, Grand Central Partnership, Inc., New York, NY, for Appellant.

Jonathan A. Willens, Assistant United States Attorney, New York, N.Y. (Mary Jo White, United States Attorney for the Southern District of New York, Gideon A. Schor, Assistant United States Attorney, on the brief), for Appellee.

Before: CABRANES and POOLER, Circuit Judges, and TRAGER, District Judge.*

TRAGER, District Judge:

Plaintiff-appellant Grand Central Partnership, Inc. ("GCP") brought this action against the Department of Housing and Urban Development ("HUD"), alleging that HUD was wrongfully withholding documents that GCP had properly requested pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"). GCP sought declaratory and injunctive relief under 5 U.S.C. § 552(a)(4)(B). In response to GCP's request, HUD produced approximately 1000 pages of material, but withheld sixteen documents under various claims of exemption from FOIA's demands. Following cross-motions for summary judgment, the United States District Court for the Southern District of New York, Louis L. Stanton, in a pair of unpublished orders entered on November 13 and December 10, 1997, ordered HUD to produce one of the sixteen withheld documents in its entirety and three in redacted form, but held that HUD had no obligation to produce the re-

---

* The Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

maining twelve documents. GCP appeals from those orders.

## Background

### (1)

In early 1995, several newspapers published reports that GCP employees used abusive and sometimes violent tactics to remove homeless persons from public spaces near Grand Central Station, in New York City. On January 26, 1996, following an investigation of GCP's conduct, HUD issued a sanction in the form of a Limited Denial of Participation ("LDP") pursuant to 24 C.F.R. § 24.705(a). This LDP denied GCP participation in HUD programs for one year on the basis of the alleged misconduct of GCP's employees and the alleged misuse of HUD funds. GCP appealed the sanction to HUD which HUD withdrew on July 1, 1996. HUD notified GCP that it was withdrawing the sanction because it was reopening its investigation into alleged GCP misconduct. GCP countered that HUD had not (and still has not) offered any proof of investigative action since July 1996.

On May 20, 1996, while its appeal was still pending before HUD, GCP submitted to HUD a FOIA request seeking, *inter alia,* "documents underlying (i) the Review of Findings of HUD investigations of the Grand Central Partnership Social Service Corporation released on or about July 5, [1995];" and (ii) HUD's decision of January 26, 1996 to impose LDP sanctions on GCP. JA 11. After a lengthy delay, having received no response from HUD, GCP commenced this action on November 1, 1996. On December 4, 1996, HUD produced over 1,000 pages of records to GCP. On January 31, 1997, HUD released 63 additional pages of records to GCP, and advised GCP that sixteen documents would be withheld on the basis of FOIA Exemptions 5 (deliberative process privilege) and 7 (law enforcement exemption). *See* 5 U.S.C. § 552(b)(5),(7) (1998). HUD provided a *Vaughn* index with that production,[1] and on March 6, 1997, provided an expanded index according to a schedule set by the district court. Along with the expanded index, HUD produced a declaration by Joseph D'Agosta, Director of the Office of Community Planning and Development for HUD's New York Office.

### (2)

In its first order, the district court agreed with HUD's contention that eight of the sixteen withheld documents, numbers 1, 2, 6, 12, 13, 14, 15 and 16, were not "agency records" subject to disclosure under FOIA based on the district court's conclusion that (i) those documents " 'were created for the personal convenience of HUD employees,' " (ii) "were kept 'in [the authors'] own personal files,' " and (iii) " '[t]he authors of the notes had no intention of circulating them to others in the agency.' " Order dated 11/13/97, *quoting* Supp. D'Agosta Aff., ¶ 10. The district court based its decision entirely on the enlarged *Vaughn* index produced by HUD and the Supplemental D'Agosta Affidavit. Any document described in the index as either "handwritten notes" or "typewritten notes" was held to be outside the scope of FOIA.

The district court directed HUD to submit the remaining eight documents to the court for *in camera* review. Following its review of the remaining documents, the district court issued its second order, in which it found that four of the withheld documents, numbers 4, 7, 8 and 11, were exempt from disclosure pursuant to sections 552(b)(5) and (7) of FOIA. However, the district court granted GCP's cross-motion, in part, directing HUD to release the remaining four documents—numbers 3, 5, and 9 in redacted form, and 10 in its entirety. *Id.* HUD released these documents to GCP on February 2, 1998 after making the redactions approved by the district court. Document 10 is no longer at issue. GCP appeals the district court's ruling as to the fifteen remaining documents, withheld in whole or in part.

Finally, GCP appeals the district court's ruling denying GCP's request for discovery in which the district court concluded that HUD had conducted a reasonable search in response to GCP's FOIA request.

---

1. *See Vaughn v. Rosen,* 484 F.2d 820, 823 (D.C.Cir.1973).

## Discussion

### (1)

 FOIA was enacted to promote honest and open government and to assure the existence of an informed citizenry " 'to hold the governors accountable to the governed.' " *Ethyl Corp. v. EPA*, 25 F.3d 1241, 1245 (4th Cir.1994) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978)). The statute was intended to advance "a general philosophy of full agency disclosure." *Federal Labor Relations Auth. v. United States Dep't of Veterans Affairs*, 958 F.2d 503, 508 (2d Cir. 1992) (internal quotation omitted). However, access to governmental information must be "orderly and not so unconstrained as to disrupt the government's daily business." *Ethyl Corp.*, 25 F.3d at 1245. Importantly, the Act is to be "construed broadly to provide information to the public in accordance with its purposes; for the same reason, the exemptions from production are to be construed narrowly." *Id.* (citing *United States Dep't of Justice v. Julian*, 486 U.S. 1, 8, 108 S.Ct. 1606, 1611, 100 L.Ed.2d 1 (1988)); *see also Local 3, Int'l Bhd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir.1988) (exemptions are to be "narrowly construed with all doubts resolved in favor of disclosure").

### (2)

 As noted by the Supreme Court, under FOIA, "federal jurisdiction is dependent on a showing that an agency has (1) 'improperly' (2) 'withheld' (3) 'agency records.' " *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142, 109 S.Ct. 2841, 2846, 106 L.Ed.2d 112 (1989) (quoting *Kissinger v. Reporters Comm. for Freedom*

*of Press*, 445 U.S. 136, 150, 100 S.Ct. 960, 968, 63 L.Ed.2d 267 (1980)). Only when each of these criteria is met may a district court "force an agency to comply with the FOIA's disclosure requirements." *Id.* The Supreme Court has also held that where the question is whether requested documents are "agency records" subject to disclosure under FOIA, "[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records....' " *Id.* at n. 3 (citing S.Rep. No. 813, 89th Cong., 1st Sess., 8 (1965)). A district court in a FOIA case may grant summary judgment in favor of an agency " 'on the basis of agency affidavits if they contain *reasonable specificity* of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.' " *Gallant v. NLRB*, 26 F.3d 168, 171 (D.C.Cir.1994) (citation omitted) (emphasis added).[2]

HUD first claimed that eight of the documents, numbers 1, 2, 6, 12, 13, 14, 15 and 16, sought by GCP are not "agency records," but rather are personal "notes" of agency employees and, therefore, are not subject to disclosure under FOIA. The district court agreed. The propriety of the district court's order turns, in part, on whether the nature of the documents at issue could be determined from HUD's proof. Because we conclude there was insufficient specificity of detail in the Supplemental D'Agosta Affidavit and HUD's *Vaughn* index to support the district court's conclusion that the requested documents are not "agency records," the district court's order cannot stand.

 Although the FOIA statute itself "does not indicate the types of documents that constitute 'agency records' within the

---

**2.** The government argues that *in camera* review rests properly with the district courts, alone, and not the appellate courts, and that even if *in camera* appellate review were proper, that it would not be proper in this case. Contrary to the government's argument, it is the well settled practice of this Court to conduct *in camera* review of contested documents in a FOIA dispute. *See, e.g., Ortiz v. United States Dep't of Health and Human Servs.*, 70 F.3d 729, 734 (2d Cir.1995) (conducting *in camera* appellate review of withheld documents), *cert. denied*, 517 U.S. 1136, 116

S.Ct. 1422, 134 L.Ed.2d 546 (1996); *Oliva v. United States Dep't of Justice*, 996 F.2d 1475, 1476 (2d Cir.1993) (same) (*per curiam*). Moreover, the record before the district court consisted entirely of a written record; no witnesses were heard and no credibility findings were made. Thus, the district court was in no better position to evaluate the record than this Court is. Accordingly, our review of the district court's orders in this case is based on our own *in camera* review of the documents at issue.

meaning of the Act," the meaning of "agency records" is now well established. *Gallant,* 26 F.3d at 171. For requested materials to qualify as "agency records," two requirements must be satisfied: (i) "an agency must 'either create or obtain' the requested materials," and (ii) "the agency must be in control of the requested materials at the time the FOIA request is made." *Tax Analysts,* 492 U.S. at 144–45, 109 S.Ct. at 2848 (citing *Kissinger,* 445 U.S. at 157, 100 S.Ct. at 972 (custody and control); *Forsham v. Harris,* 445 U.S. 169, 182, 100 S.Ct. 977, 985, 63 L.Ed.2d 293 (1980) (create or obtain)). The control requirement "accords with *Kissinger's* teaching that the term 'agency records' is not so broad as to include personal materials in an employee's possession, even though the materials may be physically located at the agency." *Tax Analysts,* 492 U.S. at 145, 109 S.Ct. at 2848. Case law makes clear that the statute does not " 'sweep into FOIA's reach personal papers that may "relate to" an employee's work ... but which the individual does not rely upon to perform his or her duties.' " *Gallant,* 26 F.3d at 171 (quoting *Bureau of Nat'l Affairs v. United States Dep't of Justice,* 742 F.2d 1484, 1493 (D.C.Cir.1984)).

In *Bureau of National Affairs ("BNA"),* the Court of Appeals for the District of Columbia Circuit was faced with the question whether appointment calendars, phone logs and daily agendas of government officials were "agency records" within the meaning of FOIA. *See Bureau of Nat'l Affairs,* 742 F.2d at 1486. As in the case at bar, the issue there was "under what circumstances can an individual's creation of a record be attributed to the agency, thereby making the material an 'agency record' disclosable under FOIA, rather than personal material not covered by the Act?" *Id.* at 1489. The court noted that the inquiry in these cases "must focus on a variety of factors surrounding the creation, possession, control, and use of the document by an agency." *Id.* at 1490 (citations omitted). Importantly, the court noted that in cases such as these, "consideration of whether and to what extent [an] employee used the document to conduct agency business is highly relevant for determining whether that document is an 'agency record' within the mean-

ing of FOIA." *Id.* at 1492. It concluded, however, that "use alone," while an important factor, was not dispositive of a document's status, and that control over a document, place of generation, and placement in agency files were still relevant factors to be considered. *Id.* at 1492. Thus, an employee's failure to place notes in agency files or to circulate such notes are important factors that weigh against a finding that notes are "agency records." Still, any such test, too broadly applied, has the potential for encouraging the creative segregation of notes to avoid the application of the statute. The *BNA* court, therefore, recommended a "totality of the circumstances" approach in which: (i) the circumstances that led to the creation (or "generation") of the document; (ii) the purpose for which the document was created; (iii) the document's actual use, including "the extent to which the creator of the document and other employees acting within the scope of their employment relied upon the document to carry out the business of the agency;" and (iv) the maintenance of the document would be considered to determine whether a document is an "agency record" and not an employee's personal record. *Id.* at 1492–93.

Applying this analysis to the documents at issue in *BNA,* the D.C. Circuit concluded that (i) telephone slips containing the name of the caller, the date and time of the call, and a number where the caller could be reached were not "agency records" within the meaning of FOIA; (ii) daily agendas detailing an agency official's schedule that were regularly circulated to employees and maintained by a secretary were "agency records;" and (iii) appointment calendars, though available to agency staff members and containing substantive information, were not "agency records" because they were not circulated to the staff and they were created solely for the convenience of individual officials.

In *Gallant,* 26 F.3d at 168, the Court of Appeals for the D.C. Circuit again faced the same issue. The *Gallant* court, following *BNA's* analysis, noted that in cases " 'where documents are created by an agency employee and located within the agency, use of the document becomes more important in deter-

mining the status of the document under FOIA.'" *Id.* at 172 (quoting *Bureau of Nat'l Affairs*, 742 F.2d at 1490). Applying the *BNA* analysis, the *Gallant* court concluded that contested documents—correspondence relating to the purely personal efforts of an NLRB official to retain her position—were not "agency records." *Id. See also Ethyl Corp.*, 25 F.3d at 1247 ("personal records of an agency employee are not agency records and are not subject to the FOIA"); *Sibille v. Fed. Reserve Bank of New York*, 770 F.Supp. 134, 137 (S.D.N.Y.1991) (stating that "[t]he courts have focused on whether the documents were used solely by the employee who created them, or were available to other agency employees, as well").

From a close reading of these cases, it is apparent that records may be "'personal' both in the sense of not related to agency business and in the sense of utilized by only one individual." *Sibille*, 770 F.Supp. at 137 (holding that handwritten notes of meetings and telephone calls kept in a locked drawer to which only the employee and the employee's secretary had access, which were not checked for accuracy, which had never been read or handled by other employees, and which had been relied upon only by the authors of the notes themselves or not at all, were not "agency records," but rather were created for the authors' personal convenience).

■ Here, although the issue is a close one, HUD's submission of the *Vaughn* index and the Supplemental D'Agosta Affidavit falls short of satisfying its burden of proving that Documents 1, 2, 6, 12, 13, 14, 15, and 16 are not "agency records" within the meaning of FOIA. The eight contested documents are described in the *Vaughn* index as "[h]andwritten [or in one case "typewritten"] notes of HUD employee." The notes are of "internal agency discussions," "interview[s] with confidential source[s]," "informal conference[s]" and "intra-agency discussion[s]." These statements do not provide any insight into the purpose for which the documents were created, the actual use to which they were put or were intended to be put, the extent to which the author and other agency employees relied on the documents, or the circumstances surrounding the maintenance of the documents. The Supplemental D'Agosta Affidavit attempts to rectify these deficiencies, stating that:

> I have consulted with the authors of these notes and, based on those conversations, I can affirm that the notes were created for the personal convenience of HUD employees to record statements made in internal meetings and confidential telephone conversations. Most of the documents are handwritten and partially illegible. The authors of the notes had no intention of circulating them to others in the agency, but kept them in their own personal files in their offices at HUD. Until the notes were provided to my staff in response to GCP's FOIA request, they had not been distributed to anyone. Personal notes of this type would normally be destroyed by the author of the notes whenever the information was no longer useful. They are not treated as part of HUD's records and would not be put into HUD's central files.

JA 55. The statements in this affidavit, while helpful to HUD's cause, do not resolve the issue whether HUD has met its burden of proof for the reason that it is the function of the federal courts to distill facts and make conclusions. In this case, those facts have been distilled and conclusions reached not by the district court, but by Joseph D'Agosta, an affiant lacking personal knowledge. D'Agosta's lack of personal knowledge is important given that at least several of the withheld documents appear to be notes of conversations between HUD employees and outside sources. These documents are of the type that usually constitute, or when subsequently typed up become, agency records. Thus, the importance of a court's evaluation of the *use* to which such documents were and might be put by the agency and its staff cannot be overestimated. For example, if at some point in the agency investigation the outside sources contradict the statements recorded in the "personal" notes, it is difficult to believe that the agency officials would not, should the need arise, use the statements to challenge the sources' credibility.

In the cases cited by the parties where a dispute existed as to the nature of records created within an agency, the government

submitted affidavits by the authors of the documents themselves, thus providing the courts with a sufficient factual basis upon which to determine whether contested items were "agency records" or personal materials. *See, e.g., Gallant,* 26 F.3d at 171; *Sibille,* 770 F.Supp. at 136; *Judicial Watch, Inc. v. Clinton,* 880 F.Supp. 1, 11 (D.D.C.1995), *aff'd on other grounds,* 76 F.3d 1232 (D.C.Cir.1996); *Kalmin v. Dep't of the Navy,* 605 F.Supp. 1492, 1495 (D.D.C.1985). In so doing, the government, in those cases, provided the courts with the opportunity to evaluate the facts and reach their own conclusions. Without more information as to how the notes at issue (or similar notes in the past) were actually used or intended to be used, we are reluctant to conclude, on the basis of the Supplemental D'Agosta Affidavit and *Vaughn* index alone, that these notes are not "agency records." Accordingly, we vacate that part of the district court's order concluding that Documents 1, 2, 6, 12, 13, 14, 15, and 16 are not "agency records" and remand for further development of the record in the form of affidavits by the actual authors of these documents and subsequent review by the district court.

(3)

Next, we address HUD's claim that two of the remaining seven documents which the district court examined *in camera* pursuant to its order—Documents 3 and 4—are covered by FOIA's fifth exemption (the deliberative process privilege). *See* Br. for Def.-App., p. 20. HUD characterizes Document 3 as a "letter dated May 24, 1995, from Councilman [Stephen] DiBrienza to HUD, outlining the results of his hearings on allegations against GCP and providing advice that HUD relied upon to reach its decision to terminate the GCP grant a few weeks later," and Document 4 as "an electronic mail message dated June 14, 1995, written just after HUD's investigators reported the results of their work." *Id.*

Exemption 5 of the FOIA exempts from production records that are "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." *See* 5 U.S.C. § 552(b)(5) (1998). Stated simply, "[a]gency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (*e.g.,* attorney-client, work-product, executive privilege) are protected from disclosure under Exemption 5." *Providence Journal Co. v. United States Dep't of the Army,* 981 F.2d 552, 557 (1st Cir.1992) (citing *United States v. Weber Aircraft Corp.,* 465 U.S. 792, 799, 104 S.Ct. 1488, 1492, 79 L.Ed.2d 814 (1984); *EPA v. Mink,* 410 U.S. 73, 86, 93 S.Ct. 827, 835, 35 L.Ed.2d 119 (1973)). The "deliberative process privilege," relied upon by HUD in part, is encompassed within the executive privilege.

Exemption 5 was:

designed to safeguard and promote agency decisionmaking processes in at least three ways: "[I]t serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action."

*Id.* (quoting *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.C.Cir. 1980)). Thus, underlying the deliberative process privilege is the rationale that "those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *United States v. Nixon,* 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974) (footnote omitted). Moreover, "efficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to operate in a fishbowl." *EPA v. Mink,* 410 U.S. 73, 87, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973) (internal quotation and citation omitted).

 To qualify for the deliberative process privilege, a document must be both "predecisional" and "deliberative." *See Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. 168, 184, 95 S.Ct. 1491, 1500, 44 L.Ed.2d 57 (1975); *Hopkins v. United States Dep't of Housing & Urban Dev.,* 929 F.2d 81, 84 (2d Cir.1991); *Providence Journal Co.,* 981 F.2d at 557. A document is predecisional when it is " 'prepared in order to assist an agency decisionmaker in arriving at his decision.' " *Hopkins,* 929 F.2d at 84 (quoting *Renegotiation Bd.,* 421 U.S. at 184, 95 S.Ct. at 1500). The privilege protects " 'recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.' " *Ethyl Corp.,* 25 F.3d at 1248 (quoting *Coastal States,* 617 F.2d at 866). Other courts have noted that "[a] document will be considered 'predecisional' if the agency can [also] (i) pinpoint the specific agency decision to which the document correlates ..." and (ii) "verify that the document precedes, in temporal sequence, the 'decision' to which it relates." *Providence Journal Co.,* 981 F.2d at 557 (internal quotation and citations omitted). Finally, "the privilege does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." *Ethyl Corp.,* 25 F.3d at 1248 (stating that relevant factors to be considered in determining whether privilege applies to a record are "the identity and position of the author and any recipients of the document, along with the place of those persons within the decisional hierarchy") (citing *Access Reports v. Dep't of Justice,* 926 F.2d 1192, 1195 (D.C.Cir.1991)).

 A document is "deliberative" when it is " 'actually ... related to the process by which policies are formulated.' " *Hopkins,* 929 F.2d at 84 (quoting *Jordan v. United States Dep't of Justice,* 591 F.2d 753, 774 (D.C.Cir.1978) (*en banc*)). Other courts have looked at similar factors such as whether the document "(i) formed an essential link in a specified consultative process, (ii) 'reflect[s] the personal opinions of the writer rather than the policy of the agency,' and (iii) if released, would 'inaccurately reflect or prematurely disclose the views of the agency.' " *Providence Journal Co.,* 981 F.2d at 559 (quoting *Nat'l Wildlife Fed'n v. Forest Serv.,* 861 F.2d 1114, 1118–19 (9th Cir.1988)). Thus, as this Court has previously noted, the privilege "focus[es] on documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.' " *Hopkins,* 929 F.2d at 84–85 (quoting *N.L.R.B. v. Sears, Roebuck & Co.,* 421 U.S. 132, 150, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975)).

 The privilege does not, however, as a general matter, cover "purely factual" material. *Hopkins,* 929 F.2d at 85 (citations omitted); *Mink,* 410 U.S. at 87–88, 93 S.Ct. at 836 ("memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery"); *Int'l Bhd.,* 845 F.2d at 1180 ("Purely factual material not reflecting the agency's deliberative process is not protected."); *cf. Providence Journal Co.,* 981 F.2d at 559 ("segregable factual portions of [ ] document might still be subject to compelled disclosure").

 With this summary of the relevant considerations, we proceed to examine the validity of Exemption 5 as applied to Documents 3 and 4. First, we address the district court's ruling with respect to Document 4, an e-mail between HUD employees discussing HUD's investigation into alleged GCP improprieties. GCP contends that HUD's submissions to the district court fail to justify the application of Exemption 5 to Document 4, making it "impossible for this Court to evaluate whether that decision is correct." Br. for Pl.-App., p. 29.[3] The district court first re-

---

3. The revised *Vaughn* index simply makes a reference to the relevance of Document 4 to the "agency decision making process." JA 43. The Supplemental D'Agosta Affidavit submitted by HUD states that from July 5, 1995 to July 1,

1996, HUD made three decisions with respect to GCP: (i) terminating the GCP grant on July 5, 1995, (ii) requiring GCP to return its grant funds (November 1995) and imposing a limited sanction on GCP (January 26, 1996), and (iii) voiding

viewed the D'Agosta Affidavits and *Vaughn* index, and, consistent with GCP's contention, concluded that HUD had not "sufficiently established that the withheld records [were] 'inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.'" JA 226 (quoting 5 U.S.C. § 552(b)(5)). The district court found that "[t]he circumstances warrant[ed] an *in camera* review of the withheld documents, in view ... [of] the conclusory nature of the agency affidavits." JA 226 (citing *Donovan v. FBI*, 806 F.2d 55, 59 (2d Cir.1986)). However, after having reviewed the contested documents *in camera*, the district court concluded that "Document 4 is wholly pre-decisional and deliberative, and need not be produced." JA 237. We agree.

Document 4 is both pre-decisional and deliberative. It is predecisional in that it is directly related to the three agency decisions detailed in the Supplemental D'Agosta Affidavit—the decisions to terminate the GCP grant, to issue the LDP sanction, and to withdraw the LDP—and precedes all three in temporal sequence. It is deliberative in that the information contained in Document 4 formed an important, if not essential, link in HUD's consultative process, and clearly reflects the personal opinions of its writer. It is also apparent that the release of Document 4 may well reflect inaccurately upon or prematurely disclose the views of HUD. Rather than being peripheral to policy formulation, Document 4 had a direct bearing on the actual exercise of a policy judgment. Nor does Document 4 contain factual matter that can be severed from its context.

Despite the strong evidence to the contrary, GCP, applying the First Circuit's *Providence Journal* test, 981 F.2d at 557, argues that:

> HUD has failed to demonstrate that the e-mail is "predecisional." Neither HUD's *Vaughn* index, nor D'Agosta's declarations "pinpoint the specific agency decision to which the document correlates." The index simply makes an oblique reference to an "agency decision making process."

Br. for Pl.-App., p. 29. While GCP's analysis is technically correct as it relates to the *Vaughn* index and D'Agosta Affidavits, it is misguided in that it fails to address the district court's *in camera* review of the withheld documents. Through its *in camera* review of Document 4, the district court concluded that Document 4 was predecisional in that it was prepared in order to assist an agency decision maker in arriving at his or her decision. The district court also concluded that Document 4 was deliberative in that it actually related to HUD's policy formulation processes. Conducting our own *in camera* review of Document 4, we have arrived at the same conclusions reached by the district court. Accordingly, we affirm with respect to the district court's decision granting HUD summary judgment as to Document 4.[4]

 Turning to Document 3, HUD contends that the district court properly redacted Document 3. Document 3 is a May 24, 1995 letter from New York City Council Member DiBrienza to HUD discussing City Council hearings that were held to investigate and discuss allegations of verbal and physical abuse of homeless persons at the hands of GCP outreach workers. In that letter, DiBrienza also voices his opinion as to

the sanction *ab initio* (July 1, 1996). The Affidavit further asserts that the withheld documents (i) were "integral" to HUD's ongoing investigation of GCP, (ii) were used by D'Agosta, his staff and other HUD employees "in the ongoing decision making process with respect to this investigation," and (iii) "reflect internal discussions among HUD officials preceding each of the three decisions concerning GCP." JA 54–55. The Supplemental D'Agosta Affidavit further provides that "[i]n each [withheld] document, HUD employees discuss the allegations against GCP and HUD's response, including HUD's decision to cancel the GCP grant and impose sanctions on GCP. I relied upon the advice and opinions ex-

pressed in these discussions in deciding to impose the LDP on GCP, and in formulating my recommendation to CPD headquarters in Washington." *Id.*

4. As previously indicated, no witness testified before the district court, and we are here dealing with the same written record that was before the district court. Thus, there is no reason not to consider the issue *de novo*. *See A Michael's Piano, Inc. v. Fed. Trade Comm'n*, 18 F.3d 138, 143 (2d Cir.1994) (conducting *de novo* review of "agency's assertion that a record being sought is exempt from disclosure [under FOIA]").

the merit of the allegations and his views on the broader policy issues presented when a business improvement district purports to serve the needs and demands of both area businesses and the homeless, constituencies that may be at odds with each other.

■ Although it is not clear upon what basis the district court rested its decision to permit redaction of Document 3, it would appear, from a review of Document 3, that the court relied upon the "deliberative process" exemption. *See* 5 U.S.C. § 552(b)(5) (1998). That privilege, however, only applies to "inter-agency" or "intra-agency" documents, and the New York City Council, of which Councilman DiBrienza is a member, is not an agency as defined in the statute. *See* 5 U.S.C. §§ 551(1), 552(f) (1998). Section 551(1) of the Administrative Procedure Act ("APA"), of which FOIA is a subsection, defines agency as "each authority of the Government of the United States," with a few exceptions that are not relevant here. Section 552(f) of FOIA incorporates the definition of "agency" contained in section 551(1) of the APA by reference. *See* 5 U.S.C. § 552(f) (1998). Despite HUD's contention to the contrary, it is beyond question that FOIA applies only to federal and not to state agencies. *See Philip Morris, Inc., v. Harshbarger*, 122 F.3d 58, 83 (1st Cir.1997) ("FOIA ... applies only to federal executive branch agencies"); *Day v. Shalala*, 23 F.3d 1052, 1064 (6th Cir.1994) (APA "pertains to federal agencies"); *Brown v. Kelly*, No. 93–5222, 1994 WL 36144, at *1 (D.C.Cir. January 27, 1994) (*per curiam* ) (FOIA does not apply to state agencies); *St. Michael's Convalescent Hosp. v. State of California*, 643 F.2d 1369, 1373 (9th Cir.1981) (definition of "agency" under FOIA "does not encompass state agencies or bodies"); *Johnson v. Wells*, 566 F.2d 1016, 1018 (5th Cir.1978) (state board of parole not agency within meaning of FOIA).

■ The only case cited by the government in support of its interpretation of the scope of Exemption 5 is *Mobil Oil Corp. v. Fed. Trade Comm'n*, 406 F.Supp. 305 (S.D.N.Y.1976) (stating that FOIA Exemption 5 applies to state agencies). The *Mobil* decision is against the overwhelming weight of the authority on this issue, and is contrary

to what we believe was Congress' intent with respect to the purpose and applicability of Exemption 5, to wit, to promote the full and frank discussion of issues within and among federal agencies. While this Court has to date been silent on this issue, other district courts within the Circuit have concluded that FOIA does not apply to state agencies. *See Thomas v. Office of the United States Attorney*, 928 F.Supp. 245, 251 (E.D.N.Y.1996) ("the FOIA is only directed to the conduct of federal agencies"); *Mamarella v. County of Westchester*, 898 F.Supp. 236, 237 (S.D.N.Y. 1995) ("FOIA does not apply to state agencies"). Accordingly, we adopt the view espoused by the other circuits and most district courts of this Circuit that have addressed the issue and hold that FOIA Exemption 5 applies to federal agencies only. In so holding, we are not deciding that documents generated by state or local officials who are participants with federal officials in joint federal criminal or civil investigations, or task forces or other federal-state or local partnerships ·are not covered by FOIA.

■ Yet, even if the New York City Council were an "agency" within the meaning of FOIA, it is hard to understand why Exemption 5 would be applicable in this instance. There is not the slightest indication that the document formed an "essential link" in the agency's policy development, *Providence Journal Co.*, 981 F.2d at 559, or that the writer was seeking confidentiality. The letter appears to report matters that were aired at a public hearing held by the New York City Council. From the language and tone of the letter, it appears that the substance of the redacted portions of the DiBrienza letter were discussed at the public hearing as well. Accordingly, we reverse the district court's judgment as it relates to this document and direct the district court to order that HUD produce the document in its entirety.

### (4)

■ Next, we consider HUD's contention that the undisclosed portions of the remaining five documents (numbers 5, 7, 8, 9 and 11) are protected from disclosure by the law

enforcement exemption, subsections 7(C) and (D) of section 552(b), as constituting either an unwarranted invasion of personal privacy or the disclosure of the identity of a confidential source. Subsection 7 exempts from disclosure:

> records or information compiled for *law enforcement purposes*, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with the enforcement proceedings ... [or] (C) could reasonably be expected to constitute an *unwarranted invasion of personal privacy*, [or] (D) could reasonably be expected to disclose the *identity of a confidential* source.

*See* 5 U.S.C. § 552(b)(7) (1998) (emphasis added).[5] Both parties agree that the documents in question were created for "law enforcement purposes."

**Exemption 7(C)—Privacy Exemption**

Although the district court did not address this contention, HUD argues that the undisclosed portions of the remaining documents are protected from disclosure by Exemption 7(C), based upon the informants' interest in maintaining the privacy of their identities. GCP counters that no such privacy interest exists, and that even if it did, it would be outweighed by the public's interest in the withheld portions of the five documents.

Exemption 7(C) protects against "unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) (1998). This language has given rise to a test that balances the individual's interest in privacy in a withheld document against the public's need for information. *See generally United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989); *Massey v. FBI*, 3 F.3d 620, 624–25 (2d Cir.1993) ("[O]nce an agency establishes that there is a privacy interest in information compiled for law enforcement purposes, that interest must be balanced against the value of the information in fur-

thering FOIA's policy goal of disclosing internal agency activities to the public."). Recognizing that the framers of FOIA did not intend unwarranted "disclosure of records regarding private citizens, identifiable by name," *Reporters Comm.*, 489 U.S. at 765, 109 S.Ct. at 1478, courts have found that "an individual has a general privacy interest in preventing dissemination of his or her name and home address." *Fed. Labor Relations Auth. v. United States Dep't of Veterans Affairs*, 958 F.2d 503, 510 (2d Cir.1992) (names and addresses of federal employees contained in computer databases); *Reporters Comm.*, 489 U.S. at 762–66, 109 S.Ct. 1468, (criminal rap sheets contained in computer databases); *Jones v. FBI*, 41 F.3d 238, 246 (6th Cir.1994) (identities of FBI agents, federal employees, state and local law enforcement personnel and other third parties who appear in documents). The courts have also recognized a privacy interest in information contained · within agency documents that might lead to the identification of witnesses or informants that goes beyond the mere protection of names and addresses. *See KTVY–TV v. United States*, 919 F.2d 1465, 1469 (10th Cir.1990) (recognizing privacy interest in names and "anything identifying" interviewees "to avoid harassment and embarrassment"); *Malizia v. United States Dep't of Justice*, 519 F.Supp. 338, 348–49 (S.D.N.Y.1981) (recognizing individuals' privacy right in information "that might identify" them).

Applying these considerations to Documents 7, 8, 9, and 11, it should first be noted that HUD does not allege that full disclosure of these documents would work an unwarranted invasion of the privacy of the persons who authored them. Nor does HUD contend that the privacy interests of persons accused of criminal or wrongful conduct would be violated by the release to GCP of Documents 7, 8, 9 and 11 in their entirety.

▆▆▆ The only issue remaining is whether disclosure of the undisclosed portions of

---

**5.** HUD contends that "this Court may [also] affirm the decision below" under Exemption 7(A). That provision, however, is not applicable in the absence of some evidence that "enforcement proceedings" are actually being conducted. *See Ac-*

*curacy in Media, Inc. v. United States Secret Serv.*, No. Civ.A. 97–2108, 1998 WL 185496, at *3 (D.D.C. April 16, 1998) (Exemption 7(A) inapplicable in absence of ongoing investigation).

these documents would work an unwarranted invasion of the personal privacy interests of the persons who provided the documents to HUD. While HUD does not allege that the identities of its sources are disclosed in these documents by either name or address, HUD does seem to imply that the sources could be identified from the information provided within the documents. It is not at all clear, however, from HUD's submissions or from this Court's review of the written record, that disclosure would, in fact, lead to the identification of the persons who provided the documents to HUD. HUD has not alleged, for example, whether Documents 7, 8, 9 and 11 contain the names of their sources, whether these documents were available only to a limited number of persons in GCP's office, or whether the documents contain specific information connecting them to the persons who provided them to HUD.

Thus, HUD has failed to establish that production of the withheld materials would work an undue invasion of privacy against the persons who provided the documents to HUD by leading to the disclosure of their identities. Accordingly, the privacy exemption does not, in this case, provide a basis upon which to exempt Documents 7, 8, 9 and 11 from disclosure, either in whole or in part.

### Exemption 7(D)—Confidential Source Exemption

Turning to HUD's other claim of privilege under the law enforcement exemption, HUD argues that full disclosure of Documents 7, 8, 9 and 11 would reveal the identity of a confidential source or sources. The district court appears to have relied upon Exemption 7(D) in determining that the undisclosed portions of the remaining documents "need not be produced because of their identification of witnesses and risk of confidential source disclosure." JA 237.

 The threshold inquiry under Exemption 7(D), as stated by the Supreme Court in *United States Dep't of Justice v. Landano*, 508 U.S. 165, 113 S.Ct. 2014, 124 L.Ed.2d 84

(1993), "is not whether the requested *document* is of the type that the agency usually treats as confidential, but whether the particular *source* spoke with an understanding that the communication would remain confidential." *Landano*, 508 U.S. at 172, 113 S.Ct. at 2019. A source is "confidential" within the meaning of Exemption 7(D) if it " 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.' " *Id.* (quoting S.Rep. No. 93–1200, at 13, U.S.Code Cong. & Admin. News, pp. 6267, 6291).[6] Where, as here, there has been no attempt to demonstrate that the agency made explicit promises of confidentiality to particular sources, the precise question before the court is whether the government "can meet its burden of showing that a source provided information on an implied assurance of confidentiality." *Landano*, 508 U.S. at 172, 113 S.Ct. at 2020. If not, there must be full disclosure of the documents.

In *Landano*, the Supreme Court rejected the government's argument that an implied assurance of confidentiality could always be inferred from the fact that a source cooperated with the FBI during a criminal investigation, and adopted a "particularized approach" to the construction of Exemption 7(D) that considers factors such as "the character of the crime at issue" and "the source's relation to the crime" in order to determine whether implied confidentiality may be inferred. *Landano*, 508 U.S. at 174–75, 179, 113 S.Ct. at 2021, 2023; *see also Massey*, 3 F.3d at 623 (citing *Landano* for same proposition). The Court also noted that there may be additional "generic circumstances" in which implied confidentiality may be inferred, such as where the informant is a witness to a gang-related murder and due to the nature of the crime would likely be unwilling to speak except on the condition of confidentiality, or where the informant is paid by the government for his or her information. *Landano*, 508 U.S. at 179, 113 S.Ct. at 2023; *Massey*, 3 F.3d at 623 (citing *Landano*). The Second

---

**6.** The Supreme Court in *Landano* concluded that "confidentiality" meant something "less than total secrecy." *Landano*, 508 U.S. at 174, 113 S.Ct. at 2020. The Court held that "[a] source should be deemed 'confidential' if the source furnished information with the understanding that the [agency] would not divulge the communication except to the extent [the agency] thought necessary for law enforcement purposes." *Id.* at 174, 113 S.Ct. 2014.

Circuit noted that "courts may look to the risks an informant might face were her identity disclosed, such as retaliation, reprisal or harassment, in inferring [implied] confidentiality." *Massey,* 3 F.3d at 623 (citing *Landano,* 508 U.S. at 180, 113 S.Ct. at 2023).

This Court has noted that "[t]he reasoning of *Landano* is not confined to situations of violent crime and the possibility of equally violent retaliation." *Ortiz v. United States Dep't of Health and Human Servs.,* 70 F.3d 729, 733 (2d Cir.1995). Rather, "Exemption 7(D) protects the identity of a confidential source in civil as well as criminal law enforcement situations, and the protection extends to situations where the danger of retaliation encompasses more than the source's physical safety." *Id.* (citation omitted). Indeed, as this Court further stated, Exemption 7(D) "is meant to (1) protect confidential sources from retaliation that may result from the disclosure of their participation in law enforcement activities, and (2) encourage cooperation with law enforcement agencies by enabling the agencies to keep their informants' identities confidential." *Ortiz,* 70 F.3d at 732. (internal citations and quotations omitted). Other courts have agreed that "serious and damaging allegations of misconduct that could initiate criminal investigations or lead to other serious sanctions can reflect an implied assurance of confidentiality." *Id.* at 734 (citing *Providence Journal Co.,* 981 F.2d at 565–66 (reasonable to infer that source expected confidentiality where source's allegations led to court martial); *United Techs. Corp. v. NLRB,* 777 F.2d 90, 94 (2d Cir.1985) ("An employee-informant's fear of employer retaliation can give rise to a justified expectation of confidentiality."); *Pope v. United States,* 599 F.2d 1383, 1386–87 (5th Cir.1979) (information given to "provoke or contribute to" investigation of attorney's fitness to practice in front of IRS gave rise to expectation of confidentiality)).

Here, HUD concedes that it "made no explicit promise of confidentiality" when it received Documents 7, 8, 9 and 11, but maintains that the source(s) of these documents "provided information under an implied assurance of confidentiality." Br. for Def.-App., p. 31. HUD asserts that the informa-

tion provided by its informants was "integral" to HUD's investigation which led to the imposition of civil sanctions on GCP. *Id.* HUD further alleges that the documents contain information about the operations of GCP that suggests the sources "have a close relationship with GCP." *Id.* HUD also contends that its sources have reason to be apprehensive of harm, retaliation or harassment based upon "reports that informants were subjected to retaliation for cooperation with other investigations of GCP." *Id.* at 32. Finally, HUD notes the seriousness of the underlying offenses being investigated—the beating of homeless persons—and concludes that its sources "must have expected confidentiality." *Id.*

GCP, nevertheless, maintains that "there are no facts from which the district court could have concluded that the alleged sources were acting with an implied expectation of confidentiality." Reply Br. for Pl.-App., p. 11. However, in its briefs, GCP, in addressing the confidentiality issue, once again, wrongly focuses on the D'Agosta Affidavits and *Vaughn* index without addressing the district court's *in camera* review. Finally, GCP contends that even if the remaining documents are found to have been given with an implied expectation of confidentiality, "[t]here is simply no basis for concluding that GCP could determine ... who turned over the memoranda." Br. for Pl.-App., p. 37.

■ In this case, the crimes alleged to have been committed by GCP outreach workers involved violence and intimidation. Homeless persons were allegedly beaten, "evicted" from bank cash machine areas, and informants were allegedly retaliated against. At the very least, GCP is alleged to have failed properly to train and/or supervise its formerly homeless outreach workers, some just weeks off the streets and with long histories of drug and alcohol dependency, and to have covered up these failures. The documents at issue were all drafted or conveyed by persons who were seemingly closely involved with certain persons who were alleged to have been involved in perpetrating these crimes and in covering them up. If the identities of the sources of these documents were disclosed, they would face an objective-

ly. real and substantial risk of retaliation, reprisal or harassment. . That retaliation need not be in the form of physical violence, but may constitute work place harassment, demotions, job transfers or loss of employment. Though the HUD investigation was civil in nature, the allegations of misconduct contained in the sources' documents are "serious and damaging" and led to the imposition of civil sanctions and the commencement of an investigation by the Manhattan District Attorney's Office. *See Ortiz,* 70 F.3d at 732. Given these facts, we conclude that HUD has met its burden of showing that its sources provided information under an implied assurance of confidentiality. That, however, only responds to half of the inquiry.

Though the question is a close one, HUD has not established that disclosure of the withheld portions of the remaining documents would reveal the identities of the documents' sources. As previously noted, HUD has not alleged whether the remaining documents contain the names of their sources, whether these documents were circulated throughout the office or available only to a limited number of persons, or whether the withheld portions of the documents contain any other specific information connecting them to their sources. Accordingly, we vacate the district court's judgment as it relates to Documents 7, 8, 9 and 11 and remand for further development of the record and subsequent review by the district court in conformity with this opinion.

**Document 5**

A few comments about Document 5 are warranted. Document 5 is a letter to HUD from a member of the public describing an incident involving the mistreatment of a homeless person in a bank cash machine vestibule by several GCP outreach workers. Document 5 has been produced to GCP pursuant to the district court's order, but with the handwritten and typewritten signatures of the author redacted.

As discussed in more detail above, FOIA exemptions should be interpreted narrowly.

Nothing in Document 5 suggests that the author of that document was seeking confidentiality when he wrote to HUD. Indeed, in the letter itself, the author writes that he "had been telling the story of what [he] saw that night to colleagues and friends for many months." Under these circumstances, it seems unlikely that either Exemption 7(C) or Exemption 7(D) applies to Document 5. We therefore vacate the district court's judgment as it relates to that document and remand in order to give HUD the opportunity to establish the applicability of those exemptions, under the framework set forth in this opinion.

(5)

We now address GCP's requests for discovery of HUD's "efforts to comply with GCP's FOIA requests." Br. for Pl.-App., p. 44. The district court found that HUD "conducted a reasonable search in response to plaintiff's Freedom of Information Act [ ] request," and accordingly denied GCP's motion to compel discovery. JA 225.[7]

 We will not disturb a district court's ruling on a motion to compel discovery unless there is a "clear showing of abuse of discretion." *United States v. Yonkers Bd. Of Ed.,* 946 F.2d 180, 185 (2d Cir.1991); *see also Carney v. United States Dep't of Justice,* 19 F.3d 807, 813 (2d Cir.1994) (applying abuse of discretion standard to Rule 56(f) application for discovery in FOIA case); *SafeCard Servs., Inc., v. Sec. and Exchange Comm'n,* 926 F.2d 1197, 1200 (D.C.Cir.1991) (noting that we will "overturn the district court's exercise of its broad discretion to manage the scope of discovery only in unusual circumstances"). As we stated in *Carney,* "discovery relating to [an] agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face." *Carney,* 19 F.3d at 812. We noted in *Safe-Card* that "to establish the adequacy of a search, agency affidavits must be ... 'rela-

7. GCP sought to depose six HUD witnesses. Those witnesses were Secretary Andrew Cuomo and his former special assistant, Mark Gordon; two senior officials in HUD's New York Office,

Joseph D'Agosta and Michael Carlson; and HUD program analysts Jane Galvin–Lewis and Rick Patoski.

tively detailed and nonconclusory, and ... submitted in good faith.'" *SafeCard*, 926 F.2d at 1200 (quotation omitted). Moreover, affidavits submitted by an agency are "accorded a presumption of good faith." *Carney*, 19 F.3d at 812 (citing *SafeCard*, 926 F.2d at 1200) (citations omitted). This presumption "cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard*, 926 F.2d at 1200 (quotation omitted); *Carney*, 19 F.3d at 813 ("something more than [ ] bare allegations is needed"). In *Carney*, we further noted that "[i]n order to justify discovery once the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations...." *Id.* at 812. (citations omitted).

GCP first contends that it should be granted leave to conduct discovery because the D'Agosta affidavits fail to support the district court's ruling that HUD conducted an adequate search for documents responsive to GCP's FOIA request. GCP asserts the D'Agosta Affidavits lack specificity. We disagree. Given the actual level of detail set forth in the D'Agosta Affidavits, and the presumption of good faith to which agency affidavits are entitled, we cannot say that the district court abused its discretion in finding the HUD search to be adequate.

That some documents were not discovered until a second, more exhaustive, search was conducted does not warrant overturning the district court's ruling. As we stated in *SafeCard*, "[w]hen a plaintiff questions the adequacy of the search an agency made in order to satisfy its FOIA request, the factual question it raises is whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant." *SafeCard*, 926 F.2d at 1201. Here, HUD conducted an initial search for responsive documents in the four offices most likely to contain such documents. After turning up nearly 1,000 pages of responsive documents, HUD performed a second search at the request of GCP's counsel. This latter search turned up an additional seventy-nine docu-

ments, sixty-three of which were promptly turned over to GCP. In any event, we have made clear that an agency's search need not be perfect, but rather need only be reasonable. *See SafeCard*, 926 F.2d at 1201.

GCP also contends that HUD acted in bad faith in its dealings with GCP and in its responses to GCP's FOIA requests, and that, therefore, GCP's discovery requests should be granted. *See* Br. for Pl.-App., pp. 39–43; Reply Br. for Pl.-App., pp. 17–18. As examples of HUD's bad faith, GCP cites: (i) the July 1995 announcement of HUD's investigation of GCP after GCP believed that HUD had agreed to close its investigation; (ii) the reports of HUD investigators which GCP claims show that GCP did not violate federal law; (iii) HUD's decision to make its case against GCP public; (iv) HUD's decisions to impose, and later withdraw, sanctions on GCP; (v) HUD's failure to reply to GCP's FOIA requests within 10 days as required by statute or to produce any documents until six months after GCP's initial FOIA request; (vi) the "surprisingly small" number of documents produced by HUD, given HUD's multi-year investigation; and (vii) the appearance that "HUD has failed to identify all documents responsive to GCP's FOIA request."

None of these contentions shows that HUD has acted in bad faith in carrying out the search of its files. We first note that GCP has not provided any evidence that HUD agreed not to pursue its investigation of alleged misconduct on the part of GCP employees. The reports of the HUD investigators contained mixed findings—one report concluded that there was sufficient evidence to conclude that homeless individuals were harassed and physically attacked by GCP workers, and that such attacks and harassment were, at a minimum, the result of negligent training and supervision. Another report found that while the GCP staff was competent, there were several problems with the training of outreach workers. HUD's decision to make its case against GCP public does not, on its face, suggest that HUD acted in bad faith; nor do HUD's decisions to impose and later withdraw sanctions necessarily indicate bad faith. Finally, we cannot

**490**

say that the production of more than 1,000 pages of documents, though not effectuated in a timely fashion, shows that HUD acted in bad faith. The remainder of GCP's allegations are nothing more than speculation that there must be more documents which HUD has deliberately or negligently failed to produce.

### Conclusion

In sum, we (1) affirm the district court's judgment as it relates to Document 4; (2) reverse the district court's judgment as it relates to Document 3 and direct the court to order HUD to release that document in its entirety; and (3) vacate the district court's judgment as it relates to Documents 1, 2, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, and 16 and remand the matter to the court for further proceedings consistent with this opinion.