Ruling on Defendant’s Motion for Summary Judgment [Doc. # 19]; Plaintiffs Motion for Partial Summary Judgment [Doc. # 24]; Plaintiffs Motion for Continuance and Discovery Pursuant to Federal Rule of Civil Procedure 56(f) [Doc. # 34]; Plaintiffs Motion to Strike [Doc. #39]; Plaintiffs Second Motion to Strike [Doc. # 43]; Plaintiffs Third Motion to Strike [Doc. # 47].
 

 ARTERTON, District Judge.
 

 This case arises under the Freedom of Information Act (“FOIA”). Plaintiff Alexander Wood (“Wood”), a reporter for the
 
 Journal Inquirer
 
 newspaper of Manchester, Connecticut, requested documents from defendants the Federal Bureau of Investigation (“FBI”) and the U.S. Department of Justice (“DOJ”), related to the investigation of FBI special agents who had been accused of misrepresenting information in arrest warrant affidavits submitted to United States Magistrate Judges. In response to Wood’s FOIA request, the Department of Justice located two responsive records and released one document, but withheld in full a memorandum from the DOJ’s Public Integrity Section under Exemptions 5, 6 and 7(C) of FOIA. The FBI located and released 447 pages of responsive documents, but redacted names and other identifying information on many of the documents pursuant to exemptions 6 and 7(C) of FOIA. Wood challenges the withholding of the DOJ memorandum, and seeks the release of information identifying the government employees investigating the alleged misconduct, and identifying Supervisory Special Agent Ralph A. DiFonzo Jr. as the subject of disciplinary action or as the subject of any personnel appeal.
 

 Pending before the Court are Defendant’s Motion for Summary Judgment [Doc. # 19]; Plaintiffs Motion for Partial Summary Judgment [Doc. #24]; Plaintiffs Motion for Continuance and Discovery Pursuant to Federal Rule of Civil Procedure 56(f) [Doc. # 34]; Plaintiffs Motion to Strike [Doc. #39]; Plaintiffs Second Motion to Strike [Doc. #43]; and Plaintiffs Third Motion to Strike [Doc. #47],
 

 For the reasons discussed below, the Court concludes that the DOJ memorandum was properly withheld as work product under Exemption 5, and that the names of the FBI and DOJ employees
 
 *CCCLXXVII
 
 involved in the investigation were properly withheld under Exemption 7(C), but not under Exemption 6. In addition, the Court finds that information identifying Special Agent DiFonzo is not exempt from disclosure. Accordingly, defendant’s Motion for Summary Judgment [Doc. # 19] is GRANTED in part and DENIED in part, and plaintiffs Motion for Partial Summary Judgment [Doc. #24] is GRANTED in part and DENIED in part. Plaintiffs Motion for Continuance and Discovery [Doc. # 34] is DENIED, as the two declarations submitted by the Department of Justice contained reasonable specificity of detail adequate to meet the Government’s burden, and carry a presumption of good faith. Finally, because the Court relied on the evidence in the record, not the 56(a)(2) statement, found the factual statements in the defendants’ declarations supported by personal knowledge, and did not rely on the unsupported conclusions or legal opinions contained in the declarations, plaintiffs three motions to strike [Docs. ## 39, 43, 47] are DENIED.
 

 I. Background
 

 In July 1996, Gregory B. Dillon, a Supervisory Inspector in the Connecticut Chief State’s Attorney’s Office, who participated in a joint state-federal task force known as the Connecticut Fugitive Task Force (CFTF), accused several FBI agents assigned to the CFTF of falsifying information in arrest warrant affidavits submitted to United States Magistrate Judges.
 
 See
 
 Declaration of Gregory B. Dillon, Feb. 21, 2003 [Doc. # 25, Ex. B] at ¶¶ 5-7. Investigations followed in the Department of Justice’s Public Integrity Section and the FBI’s Office of Professional Responsibility, after which the DOJ declined criminal prosecution, and the FBI imposed administrative discipline which in-eluded, for one agent, a five day suspension and six month probation that was later reduced, on administrative appeal, to a letter of censure.
 

 Wood’s FOIA request, filed in November 1998, requested all documents related to the investigation of these accusations.
 
 See
 
 Letter from Alexander Wood to Department of Justice, Criminal Division, Office of FOIA, November 2, 1998 [Doc. # 14, Ex. 1];
 
 see also
 
 Letter from Alexander Wood to Thomas J. McIntyre, January 7, 1999 [Doc. # 14, Ex. 3] (supplementing original FOIA request). The DOJ’s Criminal Division processed Wood’s request and forwarded it to the Office of Professional Responsibility, the Federal Bureau of Investigation, and the Executive Office of U.S. Attorneys.
 
 See
 
 Memorandum from Thomas J. Mclntrye, Chief FOI/PA Unit, Office of Enforcement Operations, Criminal Division, to Richard Rogers, Office of Professional Responsibility, November 17,1998 [Doc. # 14, Ex. 2],
 

 The Department of Justice Response:
 

 In response to Wood’s request, DOJ released two records on July 21, 1999 from the Office of Professional Responsibility after redacting the name of the FBI Special Agent under investigation pursuant to 5 U.S.C. § 552(b)(6) and (7)(C).
 
 See
 
 Letter of Thomas McIntyre to Alex Wood, July 21, 1999 [Doc. # 14, Ex. 5]. The documents released included a letter from the DOJ’s Public Integrity Section and a memorandum of the Office of Professional Responsibility, both stating that the Public Integrity Section had completed its review of the allegations of misconduct by members of the FBI’s Connecticut Fugitive Task Force (“CFTF”) and decided not to prosecute the agents, and that administrative discipline of the CFTF’s coordinator was being considered.
 
 [1]
 

 
 *CCCLXXVIII
 
 On December 20, 2001, the DOJ informed Wood that a search of the Public Integrity Section records revealed two documents responsive to his request, including one that had previously been released to Wood, and one which was being withheld in full pursuant to 5 U.S.C. § 552(b)(5), (6), and (7)(C) & (D). The letter informed Wood that the document being withheld was a 14 page Memorandum dated December 2, 1997 by James Cooper and John Scoot, Trial Attorneys, Public Integrity Section to Lee Radek, Chief, Public Integrity Section (“DOJ Memo”).
 
 See
 
 Letter from Thomas J. McIntyre to Alex Wood, December 20, 2001 [Doc. # 14, Ex. 6]. Wood filed an administrative appeal of the DOJ’s partial denial of his FOIA request, and his appeal was denied on October 3, 2002.
 
 See
 
 Letter of Alexander Wood to Office of Information and Privacy, U.S. Department of Justice, February 25, 2002 [Doc. # 14, Ex. 7]; Letter
 
 from
 
 Richard Huff, Co-Director, Office of Information and Privacy, to Alexander Wood, October 3, 2002 [Doc. # 14, Ex. 12].
 
 [2]
 
 Wood’s suit, brought in this court on November 20, 2002, challenges the withholding of the DOJ Memo under Exemption 5.
 

 The FBI Response:
 

 After Wood’s FOIA request was forwarded to the FBI, the FBI located 447 non-duplicate pages of responsive documents, and released 254 pages in full and 193 pages in part.
 
 See
 
 Declaration of Carol L. Keeley, Assistant Section Chief, Record/Information Dissemination Section, Records Management Division, Federal Bureau of Investigation, May 28, 2003 [Doc. # 15] at ¶ (9) n. 4-5. The released documents included reports of interviews undertaken in the course of the investigation, reports of factual findings by the investigators, analyses of relevant law, correspondence of various officials within the FBI and DOJ regarding the status of the investigation, the decision from the Adjudication Unit of the FBI’s Office of
 
 *CCCLXXIX
 
 Professional Responsibility, the letters to the accused special agents setting forth the administrative discipline ordered, the appeal of the special agent who received a five day suspension, and the decision, on appeal, reducing the five day suspension to a letter of censure. The documents disclosed the names of the special agents under investigation and the findings of the investigation, but redacted the names of the special agents when connected to a specific finding or to the specific form of discipline each received.
 
 See generally
 
 Notice of Filing of Release (Section 1) [Doc. # 17]; Notice of Filing of Release (Section 2, Section 1A and Referrals) [Doc. # 18]. The documents also revealed the names of the higher-level officials responsible for the investigations and the ultimate decisions regarding the accused agents, but redacted the names and other information identifying other employees of the FBI and DOJ involved in the investigation.
 
 See id.
 
 All of the redactions were made pursuant to exemptions 6 and 7(C) of FOIA. In this suit, Wood challenges the withholding of information identifying the FBI and DOJ employees involved in the investigation, and identifying Supervisory Special Agent Ralph A. DiFonzo as the subject of disciplinary action or the subject of any personnel appeal.
 

 II. Standard
 

 FOIA establishes “ ‘a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.’ ”
 
 National Labor Relations Board v. Sears, Roebuck & Co.,
 
 421 U.S. 132, 136, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) (quoting S. Rep. 813, 89th Cong., 1st Sess., 3 (1965)). Judicial review of an agency’s response to a FOIA request is
 
 de novo. See Hopkins v. Dept. of Housing and Urban Development,
 
 929 F.2d 81, 83 (2d Cir.1991).
 

 Summary judgment is appropriate when “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c). “In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA.”
 
 Carney v. U.S. Dep’t of Justice,
 
 19 F.3d 807, 812 (2d Cir.1994) (citing 5 U.S.C. § 552(a)(4)(B);
 
 EPA v. Mink,
 
 410 U.S. 73, 79, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973)). Exemptions are to be construed narrowly.
 
 See id.
 
 Summary judgment may be granted on the basis of agency affidavits “if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.”
 
 Grand Central Partnership, Inc. v. Cuomo,
 
 166 F.3d 473, 478 (2d Cir.1999) (internal quotation omitted) (emphasis omitted).
 

 III. Discussion
 

 A. DOJ Memorandum: Exemption 5
 

 Exemption 5 of FOIA protects from disclosure “inter-agency or intra-agency memorandums or letters which would not be available by law to party other than an agency in litigation with the agency ....” 5 U.S.C. § 552(b)(5). Under Exemption 5, therefore, documents that would not be subject to discovery in private litigation, such as those protected by the attorney-client privilege, work product privilege, or executive privilege, are properly withheld by the agency.
 
 See Grand Central Partnership, Inc.,
 
 166 F.3d at 481.
 

 
 *CCCLXXX
 
 The “executive privilege,” or “deliberative process privilege,” is meant to protect the “decision making processes of government agencies.”
 
 See NLRB, 421
 
 U.S. at 150, 95 S.Ct. 1504 (internal quotation omitted). The exemption of deliberative documents is designed to aid executive decisionmaking by:
 

 assur[ing] that subordinates within an agency will feel free to provide the deci-sionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; ... protecting] against premature disclosure of proposed policies before they have been finally formulated or adopted; and ... protecting] against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency’s action.
 

 Grand Central Partnership,
 
 166
 
 F.3d
 
 at 481. (internal quotation omitted).
 

 To fall within the deliberative process privilege, a document must be both “pre-decisional,” that is, “prepared in order to assist an agency decisionmaker in arriving at his decision,” and “deliberative,” or “actually ... related to the process by which policies are formulated.”
 
 Grand Central Partnership,
 
 166 F.3d at 482 (internal quotation omitted).
 

 Exemption 5 also protects attorney work product, which include materials prepared in anticipation of litigation.
 
 See Hickman v. Taylor,
 
 329 U.S. 495, 510-11, 67 S.Ct. 385, 91 L.Ed. 451 (1947). A document is considered prepared “in anticipation of litigation” if “ ‘in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.’”
 
 U.S. v. Adlman, 134 F.3d 1194,
 
 1202 (2d Cir.1998) (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Federal Practice & Procedure § 2024, at 343 (1994)). Litigation need not result. Thus, “the reports and recommended action with respect to the status of an investigation submitted before any final decision is made as to the course an investigation qualify as documents prepared in anticipation of litigation.”
 
 A Michael’s Piano, Inc. v. Federal Trade Commission,
 
 18 F.3d 138, 146-47 (2d Cir.1994).
 

 At its core, the work product privilege protects the “memoranda prepared by an attorney in contemplation of litigation which set forth the attorney’s theory of the case and his litigation strategy.”
 
 NLRB,
 
 421 U.S. at 154, 95 S.Ct. 1504. Much like the deliberative process privilege, the work product privilege is based on the assumption that the provision of legal advice or the preparation for trial would not be efficient, frank, or fair if there was a risk that the attorney’s thoughts or strategy would be revealed.
 
 See Hickman,
 
 329 U.S. at 510, 67 S.Ct. 385. Unlike the deliberative process privilege, however, a document need not be “deliberative” to qualify as work product. Under the civil discovery rules, the work product privilege includes factual as well as deliberative materials prepared in anticipation of litigation. The civil rules allow disclosure of factual work product only upon showing of “substantial need,” and provide heightened protection for deliberative materials.
 
 [3]
 

 See
 
 Fed.R.Civ.P. 26(b)(3);
 
 *CCCLXXXI
 

 A Michael’s Piano, Inc.,
 
 18 F.3d at 146;
 
 Tax Analysts v. Internal Revenue Service,
 
 117 F.3d 607, 620 (D.C.Cir.1997). The “test” for Exemption 5 is “whether information ‘would routinely be disclosed in private litigation.’ ”
 
 A Michael’s Piano,
 
 18 F.3d at 146 (quoting
 
 NLRB,
 
 421 U.S. at 149 n. 16, 95 S.Ct. 1504) (internal quotation omitted). Under FOIA, therefore, all work product is exempt, regardless of whether it is factual or deliberative.
 

 Here, the government seeks to withhold in full a 14 page memorandum dated December 2, 1997 by two trial attorneys in the DOJ’s Public Integrity Section to Lee Radek, Chief of the Public Integrity Section (“DOJ Memo”).
 
 See
 
 Letter from Thomas J. McIntyre to Alex Wood, December 20, 2001 [Doc. # 14, Ex. 6]. The Government asserts that both the deliberative process and work product privileges apply and satisfy the requirements of Exemption 5. In support, the Government has submitted a declaration and supplemental declaration by Joseph S. Beck, a litigation attorney for the DOJ Criminal Division’s Freedom of Information Act/Privacy Act Unit.
 
 See
 
 Declaration of Joseph S. Beck, May 28, 2003 [Doc. # 14] at ¶ 1; Supplemental Declaration of Joseph Beck, August 8, 2003 [Doc. # 45, Ex. A] at ¶ 1. Beck describes the DOJ memo as
 

 a communication from two Public Integrity Section staff attorneys to the Chief of their section. This document contains a discussion concerning the allegations of misconduct and the investigation of the allegations and sets forth the attorneys’ analysis, theories, recommendations and discussion of significant issues and facts used to evaluate the matter. This document therefore reflects the attorneys’ thoughts, impressions, and understanding of factors to be considered in the course of reviewing and making prosecutive decisions as well as specific facts selectively relied upon by the attorneys.
 

 Declaration of Joseph S. Beck, May 28, 2003 [Doc. #14] at ¶ 23.
 

 Beck states that the memo was prepared “for the express purpose of giving [the staff attorneys’] analyses and opinions on contemplated litigation,” and that the memo “was used for the sole purpose of determining whether criminal prosecution of the FBI agents under investigation in this case was warranted.” Supplemental Declaration of Joseph Beck, August 8, 2003 [Doc. # 45, Ex. A] at ¶¶ 4, 5. According to Beck, the Public Integrity Section made a final decision to decline prosecution after the memo was completed. As he explains: “The face of the memo bears a handwritten notation: ‘Declined JG for LJR 12/30/97.’ This notation signifies that Joseph Gangloff, then Principal Deputy Chief of the Public Integrity Section, had declined prosecution as acting chief of the section in the absence of Lee J. Radek, the section chief.” Supplemental Declaration of Joseph Beck, August 8, 2003 [Doc. # 45, Ex. A] at ¶ 6.
 

 Wood argues that the Beck declarations fail to demonstrate that the DOJ memo was properly withheld under Exemption 5. First, relying on Fed.R.Civ.P. 56(e),
 
 [4]
 
 he argues that several portions of the declarations should be stricken because they lack foundation as to Beck’s
 
 *CCCLXXXII
 
 basis of knowledge or are speculative.
 
 [5]
 

 See
 
 Plaintiffs Plaintiffs Second Motion to Strike [Doc. # 43]; Plaintiffs Third Motion to Strike [Doc. # 47]. In particular, of those portions cited above, Wood has moved to strike the statement that the memo “was used for the sole purpose of determining” whether criminal prosecution was warranted, and the statement interpreting the handwritten note on the memo. As to the first statement, Wood argues that Beck provides no basis for purporting to know all purposes for which the DOJ Memo was used over a more than five year time period. As to the second, Wood states that the handwritten note is ambiguous, and that Beck provides no basis for his interpretation.
 

 Beck’s declaration states that he is responsible for reviewing the FOIA processing files that have been compiled, and consulting with the FOIA Unit Chief and with the supervisory paralegals to confirm that determinations to withhold or to release records of the Criminal Division accord with the requirements of FOIA.
 
 See
 
 Beck Declaration [Doc. # 14] at ¶ 2. Beck also affirms, “I make this declaration on the basis of information acquired through the performance of ,my official duties.”
 
 Id.
 
 at ¶ 3; Beck Supplemental Declaration [Doc. # 45, Ex. A] at ¶ 2. “Affidavits submitted by an agency are accorded a presumption of good faith.”
 
 Carney,
 
 19 F.3d at 812 (internal quotation omitted). Moreover, generally an “affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56(e).”
 
 Id.
 
 at 814 (citations omitted). Here, Beck’s declaration establishes that he is an attorney in the Criminal Division, that he personally reviewed the DOJ memo in question, and that he acquired the information in the declaration as part of his official duties. By reviewing the memo at issue, Beck would be able to ascertain the purpose for which it was written, and the handwritten note on top reveals how the memo was used. Although Wood argues that the handwritten note is ambiguous, Beck’s statement that he acquired the information in the performance of his official duties is sufficient, when interpretation of the note requires no more than knowledge of the personnel and business practices of the Division. Beck’s declaration thus provides a sufficient basis for finding personal knowledge under Fed.R.Civ.P. 56(e).
 
 [6]
 

 Second, Wood argues that discovery is necessary before he can successfully challenge the Government’s withholding of the memo, because the Beck declarations leave unanswered several important questions about whether the memo was produced before the decision was made to decline prosecution, whether the memo was prepared because of the prospect of litigation, whether the memo was adopted as policy by the DOJ, and whether any privileges were waived.
 
 See
 
 Plaintiffs Motion for Continuance and Discovery Pursuant to Federal Rule of Civil Procedure 56(f) [Doc. # 34]. “[D]is-
 
 *CCCLXXXIII
 
 covery relating to the agency’s search and the exemptions it claims for withholding records generally is unnecessary if the agency’s submissions are adequate on their face. When this is the case, the district court may ‘forgo discovery and award summary judgment on the basis of the affidavits.’ ”
 
 Carney,
 
 19 F.3d at 812 (citations omitted). If the agency declarations are sufficient to meet the government’s burden, then the burden shifts to the plaintiff to “make a showing of bad faith on the part of the agency sufficient to impugn the agency’s affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate.”
 
 Id.
 
 (citations omitted). It is necessary, therefore, to assess the adequacy of the Government’s submission as support for its withholding under Exemption 5, and to determine whether the plaintiff has contradictory evidence or evidence of bad faith. Because the work product and deliberative process privileges are independent bases for Exemption 5, the Court will address first the work product privilege, dealing with each of Wood’s challenges in turn.
 

 1. Timing of the DOJ Memo
 

 As discussed above, a memo prepared after a final decision to decline prosecution was made could not be deemed prepared “in anticipation of litigation.”
 
 See A Michael’s Piano, Inc.,
 
 18 F.3d at 146-47. Because the work product privilege here applies only to a pre-decisional document, the central question in dispute, in this case is whether the DOJ memo was prepared prior to the final decision to decline prosecution. Beck’s declarations, which establish that the DOJ Memo was prepared on December 2, 1997 for the purpose of determining whether to pursue criminal prosecution of the FBI agents, and that the Principal Deputy Chief of the Public Integrity Section, writing on behalf of the section chief, declined prosecution on December 30, 1997, if accepted, are sufficient to meet the government’s burden of showing that the memo was pre-deci-sional.
 

 Wood challenges the Government’s declarations, and states that two Case Update Forms prepared by the FBI at the time the Public Integrity Section reviewed the matter cast doubt on Beck’s conclusion that a final decision to decline prosecution was made on December 30, 1997, approximately one month after the DOJ Memo was submitted.
 
 See
 
 Supplemental Declaration of Joseph Beck, August 8, 2003 [Doc.' # 45, Ex. A] at ¶ 6. First, Wood points to a Case Update Form dated November 20, 1997, which indicates that, on that date, a “Unit Chief’ discussed the case with Joshua R. Hochberg, the Deputy Chief of the Public Integrity Section, and that Hochberg “advised captioned case was now assigned to John Scott and a prosecutive opinion will be rendered in one week. He said the Public Integrity Section will probably decline prosecution in this matter.”
 
 See
 
 Notice of Filing of Release (Section 1) [Doc. # 17] at 397 (Case Update Form, Nov. 20, 1997). Wood argues that Hochberg’s prediction that prosecution would “probably” be declined suggests that substantive discussions with the decision-maker had likely already taken place and thus the decision may have been made, with the memo a mere formality. Second, Wood notes that a Case Update Form dated December 11, 1997 states: “UC (deletion) spoke with Public Integrity Section Attorney James Cooper regarding this matter. Mr. Cooper said that a declination memorandum has been prepared in this matter. OPR will be advised when the declination has been approved at the Public Integrity Section.”
 
 See
 
 Notice of Filing of Release (Section 1) [Doc. # 17] at
 
 *CCCLXXXIV
 
 398 (Case Update Form, December 11, 1997). Here, Wood focuses on the use of the word “when,” which he argues indicates that “Cooper conveyed to the UC complete confidence that the declination would be approved, indicating that the actual decision had been made by December 11, 1997.” Plaintiffs Reply to Defendant’s Memorandum in Opposition to Plaintiffs Motion for a Continuance and Discovery [Doc. # 54] at 6.
 

 The evidence on which Wood relies fails to rebut the government’s declarations. At most, the Case Update Forms indicate that substantive discussions within the Public Integrity Unit had taken place prior to the drafting of the DOJ Memo, and that a preliminary decision was reached to decline prosecution. But, as the use of the words “probably,” and “when,” to refer to the ultimate decision to decline prosecution plainly indicates, the final decision had not yet been made at the time the Case Update Forms were written. For the purposes of determining whether the work product privilege applies when litigation does
 
 not
 
 result, it is only the final decision by the ultimate decisionmaker that is significant.
 

 The Second Circuit considered an analogous challenge in which “some of the withheld documents may have been prepared in anticipation of closing the investigation” in
 
 A Michael’s Piano,
 
 18 F.3d at 146. The Court there concluded that the work product privilege applied as long as the investigation had not yet been closed at the time the documents were prepared.
 
 See id.
 
 (“[T]he fact that staff members may have thought that litigation might not ever occur does not take the documents out of the scope of those materials exempt because they were created in anticipation of litigation.”). Like
 
 A Michael’s Piano,
 
 here the record establishes that the investigation had not yet been closed at the time the memo from the Public Integrity Section staff attorneys was submitted to the section chief on December 2, and in fact after the memo’s submission one of its authors continued to wait for the declination to be “approved” by his superiors.
 
 See
 
 Case Update Form, December 11, 1997 [Doc. # 17] at 398;
 
 see also Coastal States Gas Corp. v. Department of Energy,
 
 617 F.2d 854, 868 (D.C.Cir.1980) (“The identity of the parties to the memorandum is important; a document from a subordinate to a superior official is more likely to be prede-cisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made.”).
 

 Wood also argues that the identity of the ultimate decision-maker is unclear from the record. Beck’s declaration states, however, that the notation on the memo stating “Declined JG for LJR 12/20/97” signifies that “Joseph Gangloff, then Principal Deputy Chief of the Public Integrity Section, had declined prosecution as acting chief of the section in the absence of Lee J. Radek, the section chief.” Supplemental Declaration [Doc. #45, Ex. A] at ¶ 6. While there might be a question about the ultimate decision-maker if a DOJ unit other than the Public Integrity Section was also responsible for deciding whether to prosecute, there is no suggestion here that any other unit had such authority. The documents Wood points to uniformly establish that the Public Integrity Section was responsible for making the final decision on whether to pursue criminal prosecution.
 
 See
 
 Memorandum of Office of Professional Responsibility, Federal Bureau of Investigation, Jan. 5, 1998 [Doc. # 18] at 409 (“On 1/5/98, the PIS/DOJ telephonically advised the prosecution has been declined”); Letter from Lee Radek, Chief, Public Integrity Section to Richard Rogers, Acting Counsel, Office of Profes
 
 *CCCLXXXV
 
 sional Responsibility, Jan. 8, 1998 (“The Public Integrity Section has completed its review .... We have determined that prosecution of the agents is not warranted .... Our file is closed.”). Wood offers no grounds for calling into question Beck’s statement that the Deputy Chief of the Public Integrity Section declined prosecution on the section chiefs behalf.
 

 2. Preparation of Memo “Because of the Prospect of Litigation”
 

 Wood argues that discovery is needed on the purposes for which the DOJ Memo was prepared, because it is conceivable that the memo “was prepared for reasons entirely apart from the prospect of litigation,” for example, for “a perceived need to be prepared to answer any future questions about this matter from Congress or higher-level officials in the executive branch.” Memorandum in Support of Plaintiffs Motion for Continuance and Discovery [Doc. # 35] at 20. Beck’s declaration clearly states, however, that the memo was prepared “for the express purpose of giving [the staff attorneys’] analyses and opinions on contemplated litigation.” Supplemental Declaration [Doc. # 45, Ex. A] at ¶ 4. This meets the government’s burden of showing the memo was prepared in anticipation of litigation, and Wood would need more than mere speculation to rebut the conclusion.
 
 See Carney,
 
 19 F.3d at 813.
 

 3. Adoption or Incorporation by Reference
 

 Wood also seeks discovery in order to determine whether any FBI employee was permitted to read the DOJ memo for guidance in the analysis of the legal issues the FBI considered during the disciplinary process. With this evidence, Wood seeks to invoke an exception to Exemption 5, namely, that the agency has incorporated by reference an intra-agency memorandum into final agency policy.
 

 The Government has asserted that the “incorporation by reference” exception does not apply to work product. The doctrine was first established in the Supreme Court’s decision in
 
 NLRB v. Sears,
 
 in which the Court held that “[i]f any agency chooses expressly to adopt to incorporate by reference an intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption other than Exemption 5.”
 
 NLRB,
 
 421 U.S. at 161, 95 S.Ct. 1504. The incorporation by reference doctrine is meant to ensure that all deliberative documents that became the agency’s final policy or opinion on the issue are disclosed. The Court in
 
 NLRB,
 
 however, also found that a memorandum that might otherwise be deemed a final opinion, necessitating disclosure under FOIA, would nonetheless be protected as work product when the decisionmaker used the decision to litigate the case.
 
 See id.
 
 at 160, 95 S.Ct. 1504. Thus, the Court concluded that the NLRB General Counsel’s Advice and Appeals Memoranda, which “explain a decision already reached by the General Counsel which has real operative effect—it permits litigation before the Board,”
 
 id.,
 
 were properly withheld under FOIA because the General Counsel was a litigating party to the case with respect to which he had made the decision.
 

 As the Supreme Court later clarified, “the kind of mutually exclusive relationship between final opinions and statements of policy, on one hand, and
 
 *CCCLXXXVI
 
 predecisional communications, on the other, does not necessarily exist between final statements of policy and other Exemption 5 privileges.”
 
 Federal Reserve v. Merrill,
 
 443 U.S. 340, 360 n. 23, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979). Moreover, because the work product exemption is construed as a “categorical rule,” and Courts thus are not at liberty to order the disclosure of work product even when civil discovery rules would allow disclosure given the particular facts of the underlying litigation, the status of the litigation does not affect the applicability of the work product exemption.
 
 See FTC v. Grolier, Inc.,
 
 462 U.S. 19, 28, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983). Interpreting these principles, several courts have concluded that “even if a document is a final opinion or is a recommendation which is eventually adopted as the basis for agency action, it retains its exempt status if it falls properly within the work-product privilege.... [A]ny argument to the effect that the attorney’s opinions in question may have become the basis for final agency action is irrelevant for the purposes of the work-product privilege.”
 
 Iglesias v. CIA, 525
 
 F.Supp. 547, 559 (D.D.C.1981);
 
 see also Exxon Corp. v. F.T. C.,
 
 476 F.Supp. 713, 726 (D.D.C.1979).
 

 The facts here also do not support Wood’s argument. Wood suggests only that the DOJ memo may have been incorporated in the decision of the FBI’s OPR Adjudication Unit, because the FBI may have reviewed the DOJ memo in preparing its decision. The OPR decision, however, nowhere references the DOJ Memo.
 
 See
 
 OPR Adjudication Unit Addendum [Doc. # 18] at 422-452. “Incorporation by reference” thus is not a viable theory in this case, and Wood’s request for discovery on this issue is accordingly denied.
 

 4. Waiver
 

 Finally, Wood seeks discovery on whether the DOJ waived the work product privilege by communicating the contents of the memo to Michael Wolf, Special Agent in Charge of the FBI’s New Haven Field Office, for use in a press interview. If so, he argues, the agency waived the Exemption 5 privilege by publicly disclosing the contents of the memorandum.
 

 “[Disclosure of work-product materials can waive the privilege for those materials if such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy....”
 
 Rockwell Intern. Corp. v. U.S. Dept. of Justice,
 
 235 F.3d 598, 605 (D.C.Cir.2001) (internal quotation omitted). It is generally necessary, therefore, to examine the scope and specificity of the disclosure.
 
 See Dow Jones & Co., Inc. v. U.S. Dept. of Justice,
 
 880 F.Supp. 145, 150-51 (S.D.N.Y.1995) (vacated in part on other grounds,
 
 Dow Jones & Co., Inc. v. U.S. Dept. of Justice,
 
 907 F.Supp. 79 (S.D.N.Y.1995));
 
 Mehl v. U.S. ERA,
 
 797 F.Supp. 43, 47 (D.D.C.1992).
 

 In a May 1999 interview with the
 
 New Haven Register,
 
 Wolf stated that the arrest warrants at issue contained “procedural errors,” “misrepresentation of immaterial facts,” and no “intentional misrepresentation of material facts.”
 
 See
 
 Declaration of Christian Miller, April 25, 2003 [Doc. #35, Ex. A] at ¶ 10; Christian Miller,
 
 FBI Tightens Fugitive Arrest Warrant Process,
 
 New Haven Register, May 16, 1999, at A4. Wolf has affirmed, however, in a declaration to this Court, that he had not reviewed the DOJ memo at the time of his interview with the New Haven Register, and that he has never seen the memo at issue.
 
 See
 
 Declaration of Michael Wolf, August 15, 2003 [Doe. #45, Ex. B] at ¶¶5, 6. Wolf thus never expressly referenced the memo at issue, and did not provide any
 
 *CCCLXXXVII
 
 specific information from the memo.
 
 [7]
 
 Under the circumstances of this ease, then, there was no waiver of the work product privilege.
 

 Because the Court finds that the Government has met its burden of showing that the work product privilege applies, and Wood’s evidence has not contradicted the government’s evidence or otherwise called the credibility of the declarants into question, Wood is not entitled to discovery. The Court concludes that the Government was permitted to withhold the DOJ memo under Exemption 5.
 

 B. FBI Release: Exemptions 6 and 7(0
 

 The FBI responded to Wood’s FOIA request by releasing all responsive documents, but redacting the names of certain government employees, as well identifying information linking the FBI agents who were subjects of the investigation to specific findings or specific forms of discipline. For each redaction, the FBI invoked the two privacy exemptions under FOIA. Exemption 6 of FOIA allows the withholding of “(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.” 5 U.S.C. § 552(b)(6). Exemption 7 protects from disclosure “records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy.” 5 U.S.C. § 552(b)(7)(C).
 

 There are important distinctions in the two exemptions. Exemption 6 covers only personnel, medical, and “similar” files, which is interpreted to mean “ ‘detailed Government records on an individual which can be identified as applying to that individual.’ ”
 
 United States Dep’t of State v. Washington Post Co.,
 
 456 U.S. 595, 602, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982) (quoting H.R.Rep. No. 1497, 89th Cong., 2nd Sess., 11 (1966), U.S.Code Cong. & Admin. News 1966, pp. 2418, 2428). Exemption 7(C) applies only when the record was “compiled for law enforcement purposes.” An agency’s investigation of its own employees, as is the subject of Wood’s FOIA request, “is for ‘law enforcement purposes’ only if it focuses directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved, result in civil or criminal sanctions.”
 
 Stern v. FBI,
 
 737 F.2d 84, 89 (D.C.Cir.1984)(internal quotation omitted);
 
 see also Perlman v. United States Dep’t of Justice,
 
 312 F.3d 100, 105 (2d Cir.2002) (report of investigation prepared in connection with investigation into whether agency employee “committed acts that could subject that employee to criminal or civil penalties” was prepared for “law enforcement purpose”). However, “an investigation conducted by a federal agency for the purpose of determining whether to discipline employees for activity which does not constitute a violation of law is not for ‘law enforcement purposes’ under Exemption 7.”
 
 Stern,
 
 737 F.2d at 90.
 

 Moreover, while both of these exemptions require the Court to balance the public interest in disclosure against the privacy interests of the individuals, the balancing test is not the same for each. As the Supreme Court explained in
 
 U.S. Dept. of Justice v. Reporters Committee For Freedom of Press,
 
 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989):
 

 
 *CCCLXXXVIII
 
 Exemption 7(C)’s privacy language is broader than the comparable language in Exemption 6 in two respects. First, whereas Exemption 6 requires that the invasion of privacy be “clearly unwarranted,” the adverb “clearly” is omitted from Exemption 7(C). This omission is the product of a 1974 amendment adopted in response to concerns expressed by the President. Second, whereas Exemption 6 refers to disclosures that “would constitute” an invasion of privacy, Exemption 7(C) encompasses any disclosure that “could reasonably be expected to constitute” such an invasion. This difference is also the product of a specific amendment. Thus, the standard for evaluating a threatened invasion of privacy interests resulting from the disclosure of records compiled for law enforcement purposes is somewhat broader than the standard applicable to personnel, medical, and similar files.
 

 Id.
 
 at 756, 109 S.Ct. 1468.
 

 Accordingly, the Government has a tougher burden to establish that withholding is proper under Exemption 6 than it does under Exemption 7(C).
 

 Here, the Government has asserted both exemptions for every name redacted in the released documents. But each exemption does not always apply. As is clear from the preceding discussion, the decision declining criminal prosecution of the FBI agents was made on December 30, 1997. Any records prepared after that date, therefore, by definition cannot relate to the investigation into whether the agents committed acts that could subject them to criminal penalties. Indeed, once the DOJ closed its criminal investigation, the case was referred back to the FBI to consider only administrative discipline. It is clear from the caselaw that records of investigations into violations of agency policy that are not subject to criminal penalty, are not prepared for “law enforcement purposes.” Therefore, the Court will first examine Wood’s challenge under Exemption 7(C), to determine whether the redac-tions on those records prepared prior to December 30, 1997 are exempt. The Court will then determine whether Exemption 6 applies to those records prepared after December 30,1997.
 

 1. Exemption 7(C)
 

 Wood first challenges the withholding of information, other than direct telephone numbers, identifying any employee of the defendants involved in the investigation of the FBI agents accused of falsifying information in arrest warrant applications, or involved in the decision-making resulting from that investigation. The issue under Exemption 7(C) is whether disclosure of the identities of these employees “could reasonably be expected to constitute an unwarranted invasion of personal privacy.” 5 U.S.C. § 552(b)(7)(C). “[W]hether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to the basic purpose of the Freedom of Information Act to open agency action to the light of public scrutiny.”
 
 Reporters Committee, 489 U.S.
 
 at 772, 109 S.Ct. 1468 (internal quotation omitted). It is necessary, then, to balance the privacy and public interests at stake.
 

 The Government has submitted a declaration by Carol L. Keeley, Assistant Section Chief in the Record/Information Division of the FBI which states that the identities of the FBI special agents conducting the investigation were withheld because
 

 their assignment to investigations is not by choice and any type of publicity concerning any particular investigation may seriously prejudice their effectiveness in
 
 *CCCLXXXIX
 
 conducting future investigations... FBI SAs conduct official inquiries into violations of various criminal statutes and in national security cases. They come into contact with all strata of society.... Those who were the focus on such official acts by FBI SAs may carry grudges which last for years and they may seek any excuse to harass the SAs involved in the investigation of themselves.
 
 [8]
 

 Keeley Declaration [Doc. # 15] at ¶ 22.
 

 • Keeley also asserts that the identities of the other FBI and DOJ employees were withheld because they may become targets of “harassing inquiries.”
 
 Id.
 
 at ¶¶ 23, 26-27.
 

 Under Exemption 7(C), it is well established that law enforcement officials acting in their official capacities have at least some claim to privacy. As the D.C. Circuit explained in
 
 Lesar v. U.S. Dep’t. of Justice,
 
 636 F.2d 472 (D.C.Cir.1980):
 

 In their capacity as public officials FBI agents may not have as great a claim to privacy as that afforded ordinarily to private citizens, but the agent by virtue of his official status does not forgo altogether any privacy claim in matters related to official business. As several courts have recognized, these agents have a legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment in either their official or private lives.
 

 Id.
 
 at 487;
 
 see also Dunkelberger v. Department of Justice,
 
 906 F.2d 779, 781 (D.C.Cir.1990) (“Exemption 7(C) takes particular note of the strong interest of individuals, whether they be suspects, witnesses, or investigators, in not being associated unwarrantedly with alleged criminal activity.”) (internal quotation omitted);
 
 Computer Professionals for Social Responsibility v. U.S. Secret Service,
 
 72 F.3d 897, 904 (D.C.Cir.1996) (The privacy interest of Exemption 7(C) “extends to persons who are not subjects of the investigation [but who] may nonetheless have their privacy invaded by having their identities and information about them revealed in connection with the investigation”) (internal quotation omitted).
 

 Wood does not dispute that at least some privacy interest exists, and instead focuses his challenge on his assertion of the public interest at stake. The FBI released all of its documents related to the investigation of the FBI employees, thus allowing public review of the comprehensiveness of the investigation, the fairness and legitimacy of the decision-making process, and the range of the disciplinary actions taken. The sole issue here, therefore, is whether the public interest in knowing who the persons involved in the investigation were would serve FOIA’s central purpose to “hold governors accountable to the governed.”
 
 Stern v. FBI,
 
 737 F.2d 84, 92 (D.C.Cir.1984). If no public interest in the names of the employees is discernable, the redactions would be proper.
 
 See Lesar,
 
 636 F.2d at 487 (finding no public interest in the public identification of the lower-level FBI personnel
 
 *CCCXC
 
 involved in the FBI’s investigation of Dr. Martin Luther King, but noting that “[t]his is not to imply a blanket exemption for the names of all FBI personnel in all documents.”);
 
 Dunkelberger,
 
 906 F.2d at 781 (finding no public interest in disclosure of identifying information where documents at issue were unrelated to “FBI agent’s alleged participation in a scheme to entrap a public official”);
 
 Stern,
 
 737 F.2d at 93 (finding withholding of names of lower-level employees proper “where the public interest in their identities is grounded only in a general notion of public servant accountability”);
 
 Davis v. United States Department of Justice,
 
 968 F.2d 1276, 1282 (D.C.Cir.1992) (“[E]ven if a particular privacy interest is minor, nondisclosure remains justified where ... the public interest in disclosure is virtually nonexistent”).
 

 Wood offers more than a generalized concern about public accountability, however. He contends that the identifying information in this case would contribute significantly to public understanding of the operations or activities of government, because “[w]hen an agency is investigating itself, with the attendant danger of direct or indirect ties between the investigators and the investigated, the public has a clear interest in knowing not just what was done in the investigation and in the decision making process—but who did it. The strong force of institutional loyalty that can come into play in such a situation represents another compelling reason for a heightened level of accountability to the public.” Plaintiffs Memorandum in Partial Opposition to Defendants’ Motion for Summary Judgment [Doc. # 37] at 5. In particular, Wood argues at length that the DOJ and FBI officials investigating the misconduct of the FBI agents were themselves biased.
 
 See id.
 
 at 13-33.
 

 Allegations of bias or other wrongdoing in the conduct of an investigation, if supported by a proper foundation, may justify public release of the identifying information.
 
 See Castaneda v. United States,
 
 757 F.2d 1010, 1012 (9th Cir.1995), amended upon denial of panel rehearing, 773 F.2d 251 (9th Cir.1985) (“Where it appears that the motives or truthfulness of the investigator are in doubt, the public need for supervision and disclosure is necessarily heightened.”). The Second Circuit has established a five part test for determining whether the public interest outweighs the government employee’s privacy interests, which examines “(1) the government employee’s rank; (2) the degree of wrongdoing and strength of evidence against the employee; (3) whether there are other ways to obtain the information; (4) whether the information sought sheds light on a government activity; and (5) whether the information sought is related to job function or is of a personal nature.”
 
 Perlman v. U.S. Department of Justice,
 
 312 F.3d 100, 107 (2d Cir.2002). Here, assessing the degree of wrongdoing is the most difficult task. Because the Second Circuit in
 
 Perlman
 
 was faced with the withholding of the identity of the subject of investigation, there was a record establishing the subject’s misconduct before the Court. Here, in contrast, there was no investigation of the investigators, and Wood can only infer misconduct by these officials on the basis of the investigatory record they prepared. While Wood’s allegations certainly are relevant to the public interest at stake, to be successful they must be specific and have some evi-dentiary ' support. Unsupported allegations or speculation will not suffice.
 

 Several of Wood’s allegations challenge the manner in which the Office of Professional Responsibility’s Adjudication Unit and the Appeals Unit weighed the evidence before them, which took place after
 
 *CCCXCI
 
 December 30, 1997.
 
 [9]
 
 Of the allegations relevant to Exemption 7(C), Wood has three main charges. First, he states that the Office of Professional Responsibility investigators never conducted polygraph tests on the issue of whether Special agent DiFonzo encouraged others to lie in their affidavits, even though all officers offered to do so. Second, Wood states that the two supervisory special agents who interviewed John F. Healy, an inspector in the Chief States Attorney’s Office, failed to ask him directly if DiFonzo encouraged others to lie. Third, Wood faults the failure of the investigators to conduct a file audit to determine if there were further instances of misrepresentation in the arrest warrant affidavits other than those identified by Dillon. In essence, Wood states that the investigators could have done more. Wood has not identified, however, any specific instances of misconduct, or any evidence affirmatively demonstrating that the persons carrying out the investigation were biased or had predetermined the results.
 

 The public interest in knowing how the government has carried out its duties has been served by the FBI’s release of its records, which has allowed Wood to assess the comprehensiveness and accuracy of the investigation. On the record before the Court, however, there is no further public interest to be served by releasing the names of the officials involved in the investigation. Accordingly, the Court finds that the names of the DOJ and FBI investigators were properly withheld under Exemption 7(C).
 
 [10]
 

 
 *CCCXCII
 
 2. Exemption 6
 

 Of those records prepared after December 30, 1997 and thus not subject to Exemption 7(C), Exemption 6 may still apply, but only if the withheld information can be deemed part of “detailed Government records on an individual which can be identified as applying to that individual.”
 
 Washington Post Co.,
 
 456 U.S. at 602, 102 S.Ct. 1957. The FBI’s withholding of the names of some of the DOJ and FBI employees involved in the investigation and decision-making process does not meet the Exemption 6 threshold. The records at issue apply to the subjects of the investigation, not to the investigators or decision-makers, and thus reveal no detailed personal information about the investigators, as would be present in personnel, medical, or similar files. The declaration the Government has offered in support of withholding these names states that the “public identification of these employees could subject them to harassment or unofficial questioning in the conduct of their official duties or private lives and could lead to the attempted compromise of these employees.” Declaration of Carol Keeley, Assistant Section Chief, Record/Information Dissemination Section, FBI, May 27, 2003 [Doc. # 15] at ¶ 15. The declaration does not address, however, how the redaction of the names of agency investigators and decision-makers meets the threshold requirement of Exemption 6. The privacy protection of Exemption 6 is narrower than that of Exemption 7(C), and the names of DOJ and FBI employees in records reflecting the employees’ performance of their official duties are not “detailed Government records on an individual.” The mere name of an agency employee involved in an investigation but not the subject of the investigation, therefore, does not qualify for Exemption 6 protection.
 

 Wood also seeks any information identifying Supervisory Special Agent Ralph A. DiFonzo Jr. as the subject of administrative disciplinary action or as the subject of any personnel appeal. This information does meet the threshold for Exemption 6 qualification, as he is the subject of the investigation to which all of the records at issue relate. The FBI’s redac-tions of the names of the subjects of the investigation, when those names were linked to specific findings or specific forms of discipline would be proper, therefore, if release would constitute a clearly unwarranted invasion of personal privacy.
 

 Wood notes that DiFonzo has been identified as the subject of the investigation, and has specifically been identified as the author of a letter appealing a suspension.
 
 See
 
 Letter of David M. Hardy, Chief, Record/Information Dissemination Section, Records Management Division, FBI, to Alexander Wood, May 27, 2003 [Doc. # 16, Ex. S] at 2 (“[E]nclosed herewith is the letter of appeal from Ralph DiFonzo, dated June 3, 1998”). Many of the specific findings against DiFonzo have also been released.
 
 See
 
 Office of Professional Responsibility Adjudication Unit Addendum, May 14, 1998 [Doc. # 18] at 449. Moreover, letters indicating the disciplinary action DiFonzo received also identify him, although, as the Government points out, the disclosures may have been inadvertent since DiFonzo’s name was redacted in most places.
 
 See
 
 Letter of C. Frank Fi-gliuzzi, May 21, 1998 [Doe. # 18] at 648; Letter of Thomas Lusby, June 10, 1999 [Doc. # 18] at 702. Wood apparently sim
 
 *CCCXCIII
 
 ply seeks confirmation of the identifying information that has already been released in part.
 

 The balance of interests clearly weighs in favor of release of the information identifying DiFonzo. DiFonzo served as Coordinator of the Connecticut Fugitive Task Force and supervised the other accused special agents. The allegations against the FBI agents in this task force of falsification of arrest warrant affidavits were particularly serious. The OPR specifically found that DiFonzo “made improper use of hearsay” in the affidavits when failing to reveal information as hearsay, and that he “relied on assumptions and inferences that resulted in the inclusion of inaccurate, albeit immaterial, statements of facts in affidavits.”
 
 See
 
 Office of Professional Responsibility Adjudication Unit Addendum, May 14, 1998 [Doc. # 18] at 449. Given his supervisory position and the seriousness of the charge, there is a strong public interest in information identifying the specific findings against him and the adequacy of the discipline imposed.
 
 See Perlman,
 
 312 F.3d at 107;
 
 Stern,
 
 737 F.2d at 93-94. Moreover, the fact that the FBI has already released much of the information Wood is requesting, inconsistently redacting information identifying DiFonzo, also counsels in favor of disclosure.
 
 See Steinberg v. U.S. Dep’t of Justice,
 
 179 F.R.D. 366, 371 (D.D.C.1998) (“Having chosen to release the names of its sources, the Justice Department cannot plausibly argue that it is still protecting their identities when it withholds the content of their interviews.”). Because release of information identifying DiFonzo as the subject of specific findings and particular disciplinary action under these circumstances would not constitute a clearly unwarranted invasion of privacy, withholding under Exemption 6 is not justified.
 

 To conclude, the Court finds that the Government may withhold the DOJ Memo under Exemption 5. The Government may also withhold the identities of the agency employees involved in the investigation at issue under Exemption 7(C), that is, it may withhold the names of the employees on those records prepared prior to the close of the criminal investigation on December 30, 1997. The government may not withhold the identities of the employees involved in the investigation or decision-making process after the close of the criminal investigation, because these names are not subject to Exemption 6. The government also may not withhold the information identifying Special Agent DiFonzo as the subject of disciplinary action or the subject of any personnel appeal.
 

 IV. Conclusion
 

 For the foregoing reasons, Defendant’s Motion for Summary Judgment [Doc. # 19] is GRANTED in part and DENIED in part; Plaintiffs Motion for Partial Summary Judgment [Doc. # 24] is GRANTED in part and DENIED in part; Plaintiffs Motion for Continuance and Discovery Pursuant to Federal Rule of Civil Procedure 56(f) [Doc. #34] is DENIED; and Plaintiffs Motion to Strike [Doc. #39], Plaintiffs Second Motion to Strike [Doc. # 43], and Plaintiffs Third Motion to Strike [Doc. # 47] are all DENIED.
 

 IT IS SO ORDERED.
 

 [1]
 

 .
 
 See
 
 Letter from Lee J. Radek, Chief, Public Integrity Division to Richard M. Rogers, Act
 
 *CCCLXXVIII
 
 ing Counsel, office of Professional Responsibility, January 8, 1998 [Doc. # 14, Ex. 5] ("The Public Integrity Section has completed its review of allegations of misconduct by members of the Federal Bureau of Investigation’s Connecticut Fugitive Task Force (CFTF). We have determined that prosecution of the agents is not warranted. As we have discussed with FBI OPR representatives, administrative discipline of the CFTF’s coordinator, Special Agent [bó, 7C] is under consideration. Our file is closed.”);
 
 see also
 
 Department of Justice, Office of Professional Responsibility Incoming Coversheet [Doc. # 14, Ex. 5] ("1/12/98: By letter to OPR dated 1/8/98, PIS/CRM Chief Radek informed that office has determined that the prosecution of the agents is not warranted. As discussed with FBI/OPR, administrative discipline of SA [bó, 7C] is under consideration. PIS/CRMs file is closed.”).
 

 [2]
 

 . On February 25, 2002, Wood also wrote to Thomas McIntyre, Chief of the FOIA/PA unit, stating that McIntyre's December 20, 2001 letter partially denying his FOIA request con-tamed no reference to the issue of discretionary release of the memorandum at issue.
 
 See
 
 Letter of Alexander Wood to Thomas McIntyre, February 25, 2002 [Doc. # 14, Ex. 9]. By letter dated April 9, 2002, McIntyre informed Wood that "Although Attorney General Reno's discretionary disclosure policy was repealed by a memorandum of Attorney General Ashcroft dated October 12, 2001, I have nevertheless again examined the single document at issue. After reviewing this document I have concluded that there is an ample legal basis to withhold it pursuant to Exemption 5 of the FOIA, 5 U.S.C. § 552(b)(5). Moreover, there is no question is my mind that disclosure of this type of material would have a profoundly adverse effect on the ability of departmental attorneys to express their candid legal opinions with regard to significant legal and policy matters. Consequently, I am unable to conclude that this document should be disclosed, even under the standards prevailing at the time your request was made.”
 
 See
 
 Letter of Thomas McIntyre to Alexander Wood, April 9, 2002 [Doc. #14, Ex. 11],
 

 [3]
 

 . Fed.R.Civ.P. 26(b)(3) allows discovery of materials "prepared in anticipation of litigation or for trial” "only upon a showing that the party seeking discovery has substantial need of the materials.” But even if the required showing has been made, "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal
 
 *CCCLXXXI
 
 theories of an attorney or other representative of a party concerning the litigation.”
 

 [4]
 

 . Fed.R.Civ.P. 56(e) provides that "[s]upport-ing and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.”
 

 [5]
 

 . Wood also argues that the portions of the declarations that contain no more than legal argument or conclusion should be stricken. The Court has relied only on the factual assertions, not the legal argument, in the declarations.
 

 [6]
 

 . Wood has also moved to strike several statements in Defendants’ Local Rule 56(a)(2) Statement on grounds that the statements are unsupported by the record.
 
 See
 
 Plaintiff's Motion to Strike [Doc. #39]. In deciding a summary judgment motion, however, it is necessary to look to the record evidence, and inappropriate to rely on the 56(a)(2) statement.
 
 See Giannullo v. City of New York,
 
 322 F.3d 139, 142 (2d Cir.2003). As the Court has relied only on the underlying evidence, not defendant's 56(a)(2) statement, plaintiff's motion is denied as moot.
 

 [7]
 

 . The Court has reviewed the DOJ memo
 
 in camera,
 
 comparing the memo with the newspaper article in question.
 

 [8]
 

 . Wood seeks to strike much of Keeley’s declaration. as lacking in personal knowledge. Keeley has affirmed in her declaration, however, that her statements "are based upon my personal knowledge, upon information made available to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.” Keeley Declaration [Doc. # 15] at ¶ 3. Moreover, while some of Keeley's statements are conclu-sory, the concern that release of the names of investigators might lead to harassment is one which is widely reflected in the caselaw.
 
 See, e.g. Lesar v. U.S. Dep’t of Justice,
 
 636 F.2d 472, 487 (D.C.Cir.1980);
 
 Dunkelberger v. Department of Justice,
 
 906 F.2d 779, 781 (D.C.Cir.1990).
 

 [9]
 

 . For example, Wood challenges the conclusions that Special Agent DiFonzo did not encourage any special agent or CFTF member to lie in their affidavits, and that Gregory Dillon, the officer who accused the agents, "may have been motivated by a political agenda or animosity.” Wood also provides examples in which, he argues, the OPR Adjudication Unit treated the falsification of source material as immaterial as long as the ultimate facts were proven to be true. Wood's focus on the decision-makers is somewhat puzzling, however, as the Court has reviewed the record and finds that the identities of the decision-makers on the disciplinary action to be taken against the accused FBI agents were in fact revealed.
 
 See
 
 Letter of C. Frank Figliuz-zi, Chief, Adjudication Unit II, Office of Professional responsibility, May 21, 1998 [Doc. # 18] at 645; Letter of Thomas Lusby, Deputy Assistant Director, Inspection Division, June 10, 1999 [Doc. #18] at 699. Thus, to the extent Wood's allegations of bias are focused only on how these decision-makers weighed the evidence before them, or the nature of the resulting sanction, this suit is no longer the vehicle to address his concerns, as the FBI has itself already released the names of the decision-makers.
 

 The names of the higher level officials providing information and recommendations to the decision-makers were also revealed. For example, the FBI New Haven Office submitted a memorandum to the Office of Professional Responsibility, recommending that no administrative action be taken against any of the accused agents. The released memorandum states that it was drafted by Gary Rohen and approved by Merrill S. Parks, Jr.
 
 See
 
 Memorandum to Office of Professional Responsibility, Feb. 26, 1998 [Doc. # 18] at 621. Merrill S. Parks was similarly identified as the author of a memorandum supporting the FBI agent’s appeal of his suspension.
 
 See
 
 Memorandum to Inspection Division, June 1, 1998 [Doc. # 18] at 667.
 

 The Court has identified only one record redacting the identities of persons participating in the decision-making process. The memorandum of the Appellate Unit evaluating the merits of the agent's appeal and recommending reducing the sanction contains redactions of the names of the officials who drafted, approved, and received it.
 
 See
 
 Memorandum to Inspection, April 30, 1999 [Doc. #18] at 650. As this memorandum was drafted in April 1999, the redactions are subject only to Exemption 6, and will be addressed
 
 infra.
 

 [10]
 

 . Wood has specifically challenged the withholding of the name of the official identified in the Case Update Form dated December 11, 1997; and the identities of the FBI Unit Chief and Case Agent in the Case Update Form
 
 *CCCXCII
 
 dated Nov. 20, 1997.
 
 See
 
 Case Update Forms [Doc. # 17] at 397, 398. Wood states that this information is relevant to his contention that the DOJ Memo, discussed above, was improperly withheld. Because Wood has identified no public interest in the disclosure of the names of these
 
 employees,
 
 their withholding is likewise proper.