ALLOCCO RECYCLING, LTD., Plaintiff,

v.

John DOHERTY, individually and as Commissioner of the New York City Department of Sanitation, Defendant.

No. 03Civ.3571(RCC)(GWG).

United States District Court, S.D. New York.

April 9, 2004.

Lawrence B. Goldberg, New York City, for Plaintiff.

Janet V. Siegel, Assistant Corporation Counsel, Environmental Law Division, New York City, for Defendant.

## MEMORANDUM DECISION

GORENSTEIN, United States Magistrate Judge.

Plaintiff Allocco Recycling, Ltd. ("Allocco") has served a subpoena upon non-party Urbitran Associates, Inc. ("Urbitran") requesting the production of certain documents prepared by Urbitran for the New York City Department of Sanitation ("DSNY"). Allocco has also requested these same documents directly from DSNY in demands for documents pursuant to Fed.R.Civ.P. 34. In response, defendant John Doherty, Commissioner of DSNY, has moved to quash the subpoena under Fed.R.Civ.P. 45(c) or for a protective order under Fed.R.Civ.P. 26(c) on the grounds that the documents are not relevant, that their production is unduly burdensome, and/or that they are protected by the deliberative process privilege. Allocco has cross-moved for an order pursuant to Fed. R.Civ.P. 37 compelling the production of these documents and other documents responsive to its Rule 34 demands for documents.

For the reasons stated below, the documents are not protected by the deliberative process privilege. Doherty's arguments regarding relevance and burdensomeness will be adjudicated in a separate ruling.

## I. BACKGROUND

### A. The Complaint

The complaint in this action alleges that Doherty violated Allocco's rights under the Due Process Clause of the Fourteenth Amendment and the Commerce Clause of the United States Constitution when DSNY denied Allocco's application for a modification of an existing permit to operate a "fill material transfer station." See Amended Civil Complaint, filed July 21, 2003 (Docket # 5) ("Complaint"), ¶¶ 28–45. A "fill material transfer station" is a structure that receives for storage non-decomposing material—such as rock, concrete, metal, paper, and glass—pending its transfer to another location. See 5 Rules of the City of New York tit. 16, § 4–01 (2003). Allocco claims that DSNY incorrectly determined that there was "sufficient private transfer station capacity" in Manhattan and hence no need for more transfer stations or volume increases. See Complaint ¶¶ 29–31. It also claims that the denial of the permit modification was the result of an illegal moratorium on new private transfer stations and modifications. See id. ¶ 31. The complaint seeks damages and a declaratory judgment requiring that, inter alia, DSNY issue Allocco a modification of its existing transfer station permit. See id. ¶¶ 45, 47.

### B. DSNY's Relationship with Urbitran

Urbitran is a multidisciplinary firm of engineers, planners, and architects headquartered in New York City. Declaration of Robert Michel, dated January 14, 2004 ("Michel Decl.") (annexed to Notice of Motion, filed January 14, 2004 (Docket # 17) ("Notice of Motion")), ¶ 1. It provides a wide range of technical and project management services to its clients, ranging from small studies to complex efforts involving design, construction, and management issues in areas such as traffic, transportation, engineering, and environmental planning. Id. DSNY is Urbitran's client for two ongoing projects for which Allocco has requested documents. Id. ¶¶ 2, 8.

#### 1. The Commercial Waste Management Study

Urbitran was retained by DSNY in 2000 to perform a survey of waste carters licensed to operate within New York City. Id. ¶ 2. This survey was entitled the "New York City Comprehensive Commercial Waste Management Study" ("Commercial Waste Management Study"). Id. The purpose of this study was to estimate the quantity, origins, and disposal locations for waste generated within New York City. Id.

The first phase of Urbitran's work on this study entailed collecting data on the volume, type, origin, and destination of commercial waste carried by private carters in New York City. Declaration of Lorenzo N. Cipollina, dated February 11, 2004 ("Cipollina Decl.") (annexed to Declaration of Janet V. Siegel, filed February 13, 2004 (Docket # 22) ("Feb. 2004 Siegel Decl.")), ¶ 4. To collect this data,

Urbitran prepared a list of carters in the region and a survey form to use in interviewing them. Michel Decl. ¶ 3. The form prepared by Urbitran requested the volume of waste carried for the year 2000 listed by origin of waste, type of waste, and location of disposal. *Id.* Urbitran organized teams of interviewers to perform the interviews, which involved visiting approximately 800 carters. *Id.* ¶ 4. Once the interviews were completed, the completed forms were entered into a database created by Urbitran. *Id.* ¶ 5. Summaries of the results were reviewed and reconciled by Urbitran using information provided by DSNY—in particular, the quarterly reports submitted to DSNY by transfer station operators. *Id.*

The findings of the Commercial Waste Management Study were summarized by Urbitran in a Preliminary Report, which was made publicly available in June 2002. *Id.* ¶ 6; *see* New York City Comprehensive Commercial Waste Management Study: Preliminary Report, dated June 2002 ("Preliminary Report") (reproduced in part as Ex. G to Declaration of Lawrence B. Goldberg in Opposition to the Motion to Quash the Subpoena to Urbitran Associates, Inc. or for a Protective Order, filed January 29, 2004 (Docket # 20)). Information contained in the individual interview forms is summarized in the Preliminary Report. Michel Decl. ¶ 6. As its name suggests, the Preliminary Report is not a final report. *Id.* ¶ 7. A new report will be issued toward the end of 2004 and will serve as the final report of the Commercial Waste Management Study. *Id.*

### 2. The Solid Waste Management Interim Plan

In addition to assisting DSNY with the Commercial Waste Management Study, Urbitran was retained by DSNY for a separate project to analyze the potential environmental impacts of various interim waste disposal options under consideration by DSNY. *Id.* ¶¶ 8–9. Specifically, Urbitran was retained to analyze potential air, noise, traffic, and neighborhood character impacts of various disposal options. *Id.* ¶ 8. This project was identified by Urbitran as the "DSNY Solid Waste Management Interim Plan" ("Solid Waste Management Interim Plan"). *Id.*

No report has yet been released to the public in connection with Urbitran's work on the Solid Waste Management Interim Plan. *Id.* ¶ 10.

### C. The Instant Motions

The instant motions arise from Allocco's discovery demands both to Urbitran (by way of subpoena) and to Doherty (by way of demands for documents). Among these demands are Allocco's request for Urbitran's documents relating to the preparation of the materials for DSNY, including the Preliminary Report. For example, Allocco has sought "[t]he data, information and facts collected by Urbitran Associates, Inc. ... concerning the [Solid Waste Management Interim Plan] and the [Commercial Waste Management Study], including but not limited to the [Preliminary Report]." Subpoena in a Civil Case, dated November 19, 2003 ("Subpoena") (reproduced as Ex. 2 to Declaration of Janet V. Siegel, dated January 14, 2004 ("Jan.2004 Siegel Decl.") (annexed to Notice of Motion)), at Rider ¶ 5.

Doherty has responded to the demands on behalf of himself, DSNY, and Urbitran, producing some documents while claiming that others either are protected by privilege or are irrelevant, or that producing the documents would be unduly burdensome. *See generally* Defendant's Response to Plaintiff's Demand for Production of Documents, dated November 13, 2003 (reproduced as Ex. F to Declaration of Lawrence B. Goldberg in Support of the Cross–Motion to Compel Production of Documents, filed February 23, 2004 (Docket # 26)). No privilege log was submitted with Doherty's response as required by Local Civ. R. 26.2.

## II. DISCUSSION

■ Doherty objects to the production of the materials sought by Allocco on the ground that the documents are protected by the deliberative process privilege. *See* Memorandum of Law in Support of Defendant's Motion to Quash a Subpoena or, Alternatively, for a Protective Order, filed January 15, 2004 (Docket # 18) ("Def.Mem."), at 7–11. A

party has standing to raise privilege objections to documents sought from a third party. *See generally Langford v. Chrysler Motors Corp.,* 513 F.2d 1121, 1126 (2d Cir.1975); *United States v. Nachamie,* 91 F.Supp.2d 552, 558 (S.D.N.Y.2000). In addition, it would appear that, because the generation of these documents resulted from Urbitran's obligations under its contract with DSNY, the documents are in fact within DSNY's control, providing a further basis for according DSNY standing to raise the privilege. *See, e.g., Palumbo v. Shulman,* 1998 WL 720668, at *1 (S.D.N.Y. Oct.13, 1998).

### A. Applicable Legal Principles

■ The deliberative process privilege is a "sub-species" of the work product doctrine. *See Tigue v. United States Dep't of Justice,* 312 F.3d 70, 76 (2d Cir.2002), *cert. denied,* 538 U.S. 1056, 123 S.Ct. 2214, 155 L.Ed.2d 1105 (2003). It has also been called the "official information" privilege, the "intragovernmental opinion" privilege, and the "executive" privilege. *See Walsh v. Chittenden Corp.,* 799 F.Supp. 405, 407 n. 3 (D.Vt.1992). The privilege shields from disclosure intra-agency or inter-agency " 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.' " *Dep't of the Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) (quoting *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)); *see also* 5 U.S.C. § 552(b)(5) (incorporating the deliberative process privilege through its exemption from disclosure under the Freedom of Information Act of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency"). Restated, the privilege protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Grand Cent. P'ship, Inc. v. Cuomo,* 166 F.3d 473, 482 (2d Cir.1999) (internal quotation marks and citations omitted). The privilege

rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.

*Klamath Water Users Protective Ass'n,* 532 U.S. at 8–9, 121 S.Ct. 1060 (internal quotation marks and citations omitted). It applies to both intra-agency and inter-agency communications. *See, e.g., Tigue,* 312 F.3d at 77; *Allstate Ins. Co. v. Serio,* 1998 WL 477961, at *3 (S.D.N.Y. Aug.13, 1998). For a particular inter-agency or intra-agency document to be protected by the privilege, the agency must demonstrate that the document is both "predecisional" and "deliberative." *See, e.g., Tigue,* 312 F.3d at 76; *Grand Cent. P'ship,* 166 F.3d at 482; *Azon v. Long Island R.R.,* 2001 WL 1658219, at *1 (S.D.N.Y. Dec.26, 2001).

■ A document is "predecisional" when it is " 'prepared in order to assist an agency decisionmaker in arriving at his decision.' " *Hopkins v. United States Dep't of Hous. & Urban Dev.,* 929 F.2d 81, 84 (2d Cir.1991) (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,* 421 U.S. 168, 184, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975)). This element distinguishes "predecisional" documents prepared before a final agency decision, which are protected, from "postdecisional memoranda setting forth the reasons for an agency decision already made," which are not. *Grumman Aircraft Eng'g Corp.,* 421 U.S. at 184, 95 S.Ct. 1491.

■ A document is "deliberative" if it is "actually ... related to the process by which policies are formulated." *Hopkins,* 929 F.2d at 84 (ellipsis in original) (internal quotation marks and citation omitted). Thus, the privilege does not protect " 'a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment.' " *Grand Cent. P'ship,* 166 F.3d at 482 (quoting *Ethyl Corp. v. EPA,* 25 F.3d 1241, 1248 (4th Cir.1994)). In making this determination, "courts look to whether the document '(i) formed an essential link in a specified consultative process, (ii) reflects the personal opin-

ions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency.'" *Azon,* 2001 WL 1658219, at *2 (quoting *Nat'l Cong. for Puerto Rican Rights v. City of New York,* 194 F.R.D. 88, 92 (S.D.N.Y.2000)).

■ In accordance with these principles, the privilege does not extend to "purely factual, investigative matters." *EPA v. Mink,* 410 U.S. 73, 89, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), *superseded on other grounds by* Pub.L. No. 93–502, 88 Stat. 1561 (1974); *accord Hopkins,* 929 F.2d at 85; *Local 3, Int'l Bhd. of Elec. Workers v. NLRB,* 845 F.2d 1177, 1180 (2d Cir.1988). If factual portions of a document are "severable without compromising the private remainder of the document[ ]," then the factual portions must be disclosed, even though the deliberative material remains protected. *Mink,* 410 U.S. at 91, 93 S.Ct. 827; *accord Providence Journal Co. v. United States Dep't of the Army,* 981 F.2d 552, 559 (1st Cir.1992).

B. *Application of the Privilege to the Documents at Issue*

Doherty did not submit a privilege log outlining exactly which documents he claims are subject to the privilege but has instead asserted that the document requests were too overbroad and vague to provide such a log. *See* Jan. 2004 Siegel Decl. ¶ 12; Feb. 2004 Siegel Decl. ¶ 19. Notwithstanding this alleged overbreadth, some identifiable documents are obviously being sought. As noted, the subpoena requests "[t]he data, information and facts collected by Urbitran Associates, Inc. ... concerning the [Solid Waste Management Interim Plan] and the [Commercial Waste Management Study], including but not limited to the [Preliminary Report]." Subpoena at Rider ¶ 5. Moreover, the identity of some documents are sufficiently obvious to Doherty that he has made detailed arguments as to why they are subject to the deliberative process privilege.

■ As an initial matter, case law is clear that documents prepared by a government consultant—such as Urbitran—may be covered by the privilege. *See, e.g., Tigue,* 312 F.3d at 77–79. Nonetheless, there is obviously no rule that documents prepared by government consultants are necessarily deliberative. Rather, a court must consider the consultant's function in preparing the documents at issue. *See, e.g., Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 858 (D.C.Cir.1980) (in order to evaluate a claim of deliberative process, "an understanding of the function the documents serve within the agency is crucial").

■ For the Commercial Waste Management Study, Urbitran was commissioned by DSNY to prepare a survey form for interviewing private waste carters and to then administer the survey. Michel Decl. ¶¶ 3–4. The form prepared by Urbitran requested factual information such as the volume of waste carried for the year 2000 listed by origin of waste, type of waste, and location of disposal. *Id.* ¶ 3. Once the surveys were completed, Urbitran entered the results into a database, reconciled the results with information provided by DSNY, and prepared the Preliminary Report summarizing its findings. *Id.* ¶¶ 5–6. For the Solid Waste Management Interim Plan, Urbitran's role is to analyze potential air, noise, traffic, and neighborhood character impacts of various waste disposal options and to report on its findings. *Id.* ¶¶ 8–9.

Doherty has provided no evidence that these circumstances reflect the making of any policy by DSNY or the personal opinion of anyone at DSNY or Urbitran. Rather, the record shows that Urbitran's role was merely to obtain, record, and analyze factual material from various waste carters and other sources. The privilege does not apply to such factual material. *See, e.g., Ethyl Corp.,* 25 F.3d at 1249–50 (summaries and graphical representations of statistical data not privileged); *Petroleum Info. Corp. v. United States Dep't of the Interior,* 976 F.2d 1429, 1438 (D.C.Cir.1992) (government file which "reorganize[d] and repackage[d]," as opposed to "select[ed] and edit[ed]," a mass of factual material not subject to privilege); *Playboy Enters., Inc. v. Dep't of Justice,* 677 F.2d 931, 935 (D.C.Cir.1982) (factual report not within privilege because compilers' mission was simply "to investigate the facts" and because the

report was not "intertwined with the policy-making process"). That the materials at issue may have been included in draft versions of the report does not alter this result. *See, e.g., Arthur Andersen & Co. v. IRS,* 679 F.2d 254, 257 (D.C.Cir.1982) (*"Coastal States* forecloses the ... argument that any document identified as a 'draft' is per se exempt."); *Judicial Watch, Inc. v. United States Postal Serv.,* 297 F.Supp.2d 252, 261 (D.D.C.2004) ("[D]rafts are not presumptively privileged.").

The essence of Doherty's argument is summed up in his contention that the documents are "protected by the deliberative process privilege because they were prepared to assist [DSNY] in making broad policy decisions about the City's waste management practices and programs." Def. Mem. at 8; *accord id.* at 10 ("[D]rafts and other internal documents that led to the completion of the Preliminary Report are deliberative because they form the basis for the Preliminary Report which, in turn, provides the basis for [DSNY's] decision-making about managing the City's waste stream."); Reply Memorandum of Law in Support of Defendant's Motion to Quash a Subpoena or, Alternatively, for a Protective Order, and in Opposition to Plaintiff's Cross–Motion to Compel Production, filed February 13, 2004 (Docket # 23) ("Def. Reply Mem."), at 9 ("[B]y their very nature, the draft documents are deliberative because they led to the publication of the Preliminary Report, which indisputably formed the basis for [DSNY's] policy decision to terminate pending permit and permit modification applications.").

Doherty's argument, however, finds no support in the case law describing what constitutes "deliberative" material. It is of no consequence that documents may "assist," "lead to," or "form the basis for" some governmental policy. In other words, the mere fact that an agency's deliberations regarding a policy involve the consideration of particular documents does not render those documents protected by the deliberative process privilege. Rather, protection is provided

only for those documents that actually "reflect[ ] advisory opinions, recommendations and deliberations." *Klamath Water Users Protective Ass'n,* 532 U.S. at 8, 121 S.Ct. 1060 (internal quotation marks and citation omitted). Doherty has not shown that the internal documents and drafts created by Urbitran in preparing the Preliminary Report in and of themselves actually "reflect[ ]" DSNY's decision-making process—as opposed to being documents that have been or will be relied upon as part of that decision-making process. Doherty seems to believe that resolution of the deliberative process issue may turn on the fact that the Commercial Waste Management Study was prepared "pursuant to a legislative mandate from the New York City Council." Def. Reply Mem. at 8. But the reason for the preparation of documents cannot be dispositive. The sole issue is whether the documents themselves reflect DSNY's deliberations. Doherty has provided no evidence that they do.

Case law helps to demonstrate why the documents are not "deliberative." In *Hennessey v. US AID,* a government agency commissioned a third-party surveyor to conduct an independent review of the reasons for certain construction delays in building a university. 121 F.3d 698, 1997 WL 537998, at \*1 (4th Cir. Sept.2, 1997) (per curiam) (unpublished table decision).[1] The surveyor was charged with preparing a report outlining the historical record of when the various construction activities took place, detailing the methodology for its report, and including a causation section attributing responsibility for specific delays. *Id.* In reversing the district court's conclusion that the report was protected by the deliberative process privilege, the Fourth Circuit stated:

> The district court concluded that several portions of the report could not have been produced without the exercise of some judgment and are therefore closer to opinion than fact. For example, it reasoned that the methodology section was not factual because it involved an assessment of which particular steps in the construction project had an effect upon overall delays.

---

1. Under the rules of the Fourth Circuit, citation of unpublished decisions is explicitly permitted where, as here, the opinion "has precedential value in relation to a material issue in a case and ... there is no published opinion that would serve as well." U.S.Ct. of App. 4th Cir. R. 36(c).

It further reasoned that the causation section was not purely factual because it included "recommendations concerning [the building contractor's] responsibility, if any, for delay in completion of the project to-date." While it is doubtless true that the process of composing these portions of the final report may have involved the exercise of some judgment or discretion, the [report] must ultimately be regarded as factual because it is written as an objective and retrospective recitation of historical facts. . . . To the extent that any portion of the report expresses an "opinion," it is simply an opinion regarding what occurred in the past rather than advisory opinion regarding future agency action.

*Id.* at *4 (citation and footnote omitted).

Similarly, the fact that DSNY personnel or Urbitran exercised some judgment or discretion in deciding how to compose the Preliminary Report itself is of no consequence. There is simply no basis for concluding that any of the materials themselves constitute "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," *Klamath Water Users Protective Ass'n,* 532 U.S. at 8, 121 S.Ct. 1060 (internal quotation marks and citation omitted). In other words, Doherty has not demonstrated that these materials "bear on the formulation or exercise of policy-oriented judgment," *Grand Cent. P'ship,* 166 F.3d at 482 (internal quotation marks and citation omitted).

■ Doherty also argues that any notes on the documents made by DSNY's Deputy Commissioner for Financial Management and Administration, Lorenzo N. Cipollina, should be protected because they constitute "editorial comments and assessments from DSNY and Urbitran staff regarding the scope, substance, and findings of the two projects." Def. Reply Mem. at 9. But Cipollina in his affidavit states only that he provided "editorial comments" on various documents, such as survey forms, environmental assessment statements, statistical summaries, and drafts of the Preliminary Report itself. Cipollina Decl. ¶¶ 5, 7. What is missing is any contention that these written notes constituted a record of deliberations on a DSNY policy.

Doherty seems to believe that only purely factual material is exempt from the deliberative process privilege and thus that the notes of an agency employee commenting on drafts necessarily constitute "deliberative" material. *See* Def. Reply Mem. at 9. Case law, however, does not give the term "deliberative" such a broad reading. As one court put it, comments from an agency employee that constitute "give-and-take" with respect to the content of documents are not privileged because "the give-and-take must regard 'opinions on legal or policy matters.' If the [documents] themselves merely restate facts, and do not involve 'legal or policy matters,' any comments or opinions about these same [documents] are not privileged." *Judicial Watch,* 297 F.Supp.2d at 263 (quoting *Vaughn v. Rosen,* 523 F.2d 1136, 1143–44 (D.C.Cir. 1975)).

Similarly, in *Azon,* the court determined that drafts of an internal investigative report, which included handwritten comments in the margins and line edits, were not protected because they were "almost exclusively devoted to clarifying the facts underlying the [agency's] internal investigation, and thus [were] patently not 'opinions' or 'recommendations.'" 2001 WL 1658219, at *2. Cipollina's declaration does not indicate that his personal views, deliberations, or recommendations on the ultimate policy or decision to be made by DSNY were conveyed in his notes to Urbitran. Absent a showing that Cipollina's "editorial comments" concerned his "opinions on legal or policy matters" and not mere factual matters, Doherty cannot claim any entitlement to the privilege.

*Conclusion*

For the foregoing reasons, Doherty has not demonstrated that any documents are protected by the deliberative process privilege.